J-S21029-17 & J-S21030-17

2017 PA Super 202

| IN THE MATTER OF THE ADOPTION OF: M.A.B. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: ERIE COUNTY OFFICE OF CHILDREN & YOUTH | : | |
| | : | |
| | : | |
| | : | No. 1720 WDA 2016 |

Appeal from the Decree October 10, 2016
In the Court of Common Pleas of Erie County
Orphans' Court at No(s):  No. 68A In Adoption 2015

| IN THE MATTER OF THE ADOPTION OF N.M.B. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: ERIE COUNTY OFFICE OF CHILDREN & YOUTH | : | |
| | : | |
| | : | |
| | : | No. 1721 WDA 2016 |

Appeal from the Order October 10, 2016
In the Court of Common Pleas of Erie County
Orphans' Court at No(s):  68 In Adoption 2015

| IN THE MATTER OF THE ADOPTION OF N.M.B. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: N.M.B., MINOR CHILD | : | |
| | : | |
| | : | |
| | : | No. 1722 WDA 2016 |

Appeal from the Decree October 10, 2016
In the Court of Common Pleas of Erie County
Orphans' Court at No(s):  No. 68 In Adoption 2015

J-S21029-17 & J-S21030-17

IN THE MATTER OF THE ADOPTION OF: M.A.B.       :   IN THE SUPERIOR COURT OF PENNSYLVANIA

APPEAL OF: M.A.B., MINOR CHILD   :

:  No. 1723 WDA 2016

Appeal from the Decree October 10, 2016
In the Court of Common Pleas of Erie County
Orphans' Court at No(s):  68A In Adoption 2015

BEFORE:   LAZARUS, DUBOW, and STRASSBURGER[*], JJ.

OPINION BY DUBOW, J.:                **FILED JUNE 29, 2017**

In these consolidated appeals, the Erie County Office of Children and Youth ("Erie OCY"), and the minor children, M.A.B. (born August 2009) and N.M.B. (born August 2010) ("Children") appeal[1] from the Decree entered by the Honorable Daniel J. Brabender denying Erie OCY's petition to terminate the parental rights of ("Mother") and ("Father") pursuant to 23 Pa.C.S. §§ 2511(a) and (b).  After careful review, we reverse and remand for further proceedings.

This case involves two special needs children, a mother who has failed and refused to address her substance abuse and mental health issues, and a

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] This Court consolidated the appeals filed at 1720 WDA 2016 and 1721 WDA 2016 by the Erie County Office of Children and Youth into J-S21029-17.  We separately consolidated the appeals filed at 1722 WDA 2016 and 1723 WDA 2016 by the Children, M.A.B. and N.M.B., into J-S21030-17.  We address each consolidated appeal together in this Memorandum.

- 2 -

father who has failed and refused to separate from Mother. Our detailed review of the certified record reveals the following factual and procedural history relevant to these appeals.

In June 2013, and again in October 2013, Venango County Children, Youth and Family Services ("Venango CYS") became involved with the family after ChildLine received reports that the Mother and Father were inappropriately disciplining the Children. Further investigation determined the allegations to be either invalid or unfounded, and CYS closed the cases at intake.

In September of 2013, the court revoked Father's parole after he moved to Kentucky without permission, and he returned to prison.[2] Paternal Grandmother ("Grandmother") then agreed with Mother to help care for the Children.

On February 26, 2014, Grandmother called Venango County CYS to report that Mother had been admitted to an inpatient mental health and substance abuse treatment facility,[3] and Grandmother would not be able to meet the Children's needs. Venango CYS filed an emergency motion, which the trial court granted, and CYS placed the Children in foster care.

_____

[2] When Father violated, he was on parole after serving time for, *inter alia*, his sixth criminal trespass and simple assault convictions. His prior convictions occurred between 1993 and 2006.

[3] Mother had received inpatient mental health treatment at least twice prior to the 2014 placement, beginning in 2003 when Father hospitalized Mother after fearing for Mother's safety.

Subsequently, the court granted legal and physical custody of the Children to Venango CYS, and directed that the Children remain in foster care. The court also directed Mother to complete her inpatient treatment and Venango CYS established a permanency plan for the parents.

By March 2, 2014, Mother had moved to Erie, where she was receiving outpatient mental health and substance abuse treatment from psychiatrist Dr. Belinda Stillman[4] and treatment counselors at Stairways Behavioral Health ("Stairways"). On March 12, 2014, the court adjudicated the Children dependent due to Father's continued incarceration, Mother's substance abuse in the home, Mother's mental health status, and poor housing conditions. At that initial dependency hearing, Venango CYS developed permanency plans for each parent, and the court established a concurrent placement goal of return to parent and adoption. The children remained in foster care.

On March 17, 2014, Father was released from SCI Albion to the Erie County Community Corrections Center. Mother continued to reside in Erie and participate in outpatient therapy through Stairways.

In July 2014, jurisdiction was transferred to Erie County, and Erie OCY moved the Children to their second foster home. Dr. Stillman conducted psychiatric evaluations of Mother and Father. Mother received a diagnosis of

_____

[4] Dr. Stillman had been involved with the parents off and on since 2009.

bipolar disorder and opioid dependency; Father received a diagnosis of bipolar disorder and alcohol dependency in remission.

On August 20, 2014, the dependency court held a permanency hearing,[5] after which the court determined that the parents had moderately complied with the permanency plan established in Venango County, and had made moderate progress toward alleviating the conditions which led to placement. In addition, the Court established treatment plans for the parents:

> The Court directed the parents to refrain from the use of drugs and/or alcohol and submit to random urinalysis; to continue to address mental health needs by attending all mental health appointments, follow through with recommendations and demonstrate mental health stability; participate in an approved parenting program and demonstrate ability to meet [Children's] needs, including attending medical appointments for [them]; attend scheduled visitation with [Children]; and obtain and/or maintain safe housing. The Court specified [Mother's] random urinalysis was to occur at the Esper Treatment Center, and [Mother] was to inform [Erie OCY] of any changes in medication management. The Court continued in effect the permanency goals of reunification, concurrent with adoption. The Community Corrections Pre-Release Center, Erie County Adult Probation, Stairways, and Esper Treatment Center were directed to release to [Erie OCY] the results of the [parents'] random urinalysis testing. [Children] were to remain in their current foster placement setting.

Orphans' Court Opinion, dated 10/10/16, at 4-5 (citations omitted).

On October 27, 2014, the court held a permanency review hearing at which Erie OCY informed the court that since August 2014, Mother had

_____

[5] The Honorable John J. Trucilla presided at each permanency review hearing.

- 5 -

attended only two appointments at Stairways and had missed three group therapy sessions and two office visits. Mother had informed Erie OCY that she had stopped taking Suboxone on August 29, 2014. She and Father were living together at a new apartment as of October 1, 2014. Father had a full-time job, often in excess of 50 hours per week. Father attended at least one 12-step recovery program during each week, attended counseling and parenting classes, and attended all scheduled visits with the Children. However, neither Father nor Mother consistently complied with random urinalysis screening. Erie OCY conceded Father's failure was partially due to his work schedule.

Erie OCY continued to recommend concurrent goals of reunification and adoption, and further recommended that, because visits with the Children had gone well for both parents, the parents' visitation with the Children be increased in duration and decreased in the level of supervision, depending on the parents' mental health stability, maintenance of sobriety, and demonstration of adequate parenting skills. The court directed both parents to continue substance abuse and mental health treatments, as well as submit to random drug testing.

At a permanency hearing on December 17, 2014, Erie OCY reported that Mother had not yet begun random urinalysis screenings and had discontinued medications without medical advice. Although Mother had attended an assessment at Stairways, she had not yet made an appointment for medication management. Corry Counseling Family Preservation accepted

the family for services, but had difficulty contacting Mother and had only recently scheduled a first session with her. Mother attended supervised visits regularly.

The court directed the continuation of the treatment goals for the parents and the concurrent placement goals for the Children. The court further directed Mother to return to mental health therapy and medication management at Stairways, submit to random urinalysis tests, attend 12-Step meetings and addiction counseling, and supply a release for a doctor to confirm that the reason Mother had not attended urinalysis testing was due to issues with her catheter as she had reported.

On or about January 26, 2015, Erie OCY transferred the Children to a third foster home, which is now the Children's pre-adoptive home. At that time, the Children were four and five years old, respectively, neither was fully toilet trained, and both exhibited behaviors consistent with autism.[6]

On February 23, 2015, Mother was admitted to New Directions Health Care to receive methadone treatment for opiate addiction. However, on April 7, 2015, Mother left treatment because of other health issues requiring hospitalization. After her health issues were resolved, the treatment facility reached out to Mother to continue treatment, but she declined.

_____

[6] M.A.B. had received a diagnosis of autism in 2012. Although not officially diagnosed with autism, N.B. began receiving Early Intervention services in December 2013 to address his significant delays in social, adaptive, cognitive and motor development.

At a permanency review hearing on March 6, 2015, an Erie OCY representative reported that Mother had a number of "no-show positives" for urinalysis testing, she had not provided verification of attendance in a 12-Step program, and was not participating in mental health treatment. On four occasions, Mother's urinalysis tests had negative results. Mother had been attending parenting training classes, and Erie OCY reported that Mother's visits with the Children had gone relatively well, although both parents had difficulty redirecting the Children's negative activities and behavior at times. However, at some point prior to March 6, 2015, Erie OCY had suspended Mother's visits with the Children due to her "no-show positive" urinalysis screening results and OCY's consequent inability to ensure Mother's sobriety and the Children's safety. Erie OCY also expressed concern about Mother's demonstrated inconsistency in her parenting, which in the past had caused difficulty with regards to the Children's development and social skills.

Erie OCY reported that Father had not provided it with any verification of his attendance at AA, and he had been discharged from Stairways after completing his mental health programming. Erie OCY also reported that Father's solo visits with the Children had gone well in that Father was patient and appropriate in managing the Children. Erie OCY also reported that Father had regular phone contact with the Children.

In addition, Erie OCY reported that it had advised Father that if Mother continued to be non-compliant with the permanency plan and Father

continued to live with Mother, his reunification with the Children could be jeopardized due to the Children's safety. Father also informed the court he was aware of Mother's non-compliance and the impact it could have on reunification.

The court continued the suspension of Mother's visits, and continued to maintain the concurrent goals of reunification and adoption at OCY's recommendation. The court directed Mother to provide OCY with verification of her attendance at 12-Step meetings, any recommended substance abuse counseling, and a mental health assessment. The court directed Father to continue to participate in the Family Preservation Program, and continue to demonstrate his ability to provide appropriately for the Children's health and special needs. The visits with the Children remained partially supervised.

In May 2015, Mother submitted to two random urinalysis screenings, which were positive for Suboxone. Mother reported that she had obtained the drugs through a prescription from her physician.[7] Also in May 2015, while the Children were with Father on an unsupervised visit, Father permitted the Children to have contact with Mother despite the court's suspension of her visits. The parents later admitted to the unauthorized contact.

On June 29, 2015, the dependency court held a permanency review hearing at which Erie OCY recommended that the permanency goals for the

---

[7] Suboxone was the same substance she had previously reported to OCY that she was purchasing and using illegally.

Children be changed to adoption due to Mother's noncompliance with court-ordered mental health and sobriety treatment services and her continuing substance abuse, and Father's failure to obtain a residence separate and apart from Mother to ensure the Children's safety. By this time, the Children had been in placement for 16 months. The Erie OCY expressed concern about the level of care needed to meet the Children's special needs, and the parents' abilities to meet those needs. It further indicated that it "gave the [F]ather opportunities to explore living arrangements separate from his wife because, in OCY's view, the [M]other could potentially present a risk to the [C]hildren because of unaddressed mental health or drug and alcohol issues." TCO, dated 10/1/16, at 10, citing N.T., 1/28/16. The Erie OCY also indicated that Father did not seem to understand the risk that Mother's unwillingness to commit to her sobriety and mental health stability had on the Children's safety and welfare; and reported that despite court orders, Father had allowed Mother to be present during one of his visits with the Children. Erie OCY recommended that no further services be offered to the parents and no visitation be offered.

The dependency court changed the placement goals to adoption, and directed the Erie OCY to file termination petitions. Neither parent appealed the goal change.

On August 26, 2015, Erie OCY filed Petitions to Terminate the Parental Rights ("TPR Petitions") of Mother and Father pursuant to 23 Pa.C.S. §§ 2511(a)(1),(2), (5), (8), and (b).

On January 28, 2016, and March 8, 2016, the Honorable Daniel Brabender, sitting as Orphans' Court, held an evidentiary hearing. The court acknowledged that the written court summaries from each permanency review hearings were part of the record. In addition, the court heard testimony from Dr. Stillman; Erie OCY case workers; the Children's special education teacher, the pre-adoptive/foster mother, and Father.

Brianne Baran of the Erie County OCY, testified that Mother was registered for random urinalysis screening at the Esper Treatment Center from October 6, 2014 until August 23, 2015, when she was removed from the system for non-compliance. Baran testified that Mother had 79 "no-show positive" results, 30 clean results, and two positive results for Suboxone. Father was registered for urinalysis screenings at the Esper Treatment Center from October 6, 2014 until December 23, 2014. He had 30 "no-show positive" results, which Baran conceded may have been due to Father's work schedule. *See* N.T., 1/28/16, at 104-10.

Carrie Luther, a supervising Erie OCY case worker, testified about the content of the court summaries from each permanency review hearing. She particularly noted Mother's minimal progress in meeting her substance abuse and mental health treatment goals, her failure to attend urinalysis screenings, and Father's moderate progress in meeting the goals set by the dependency court and Erie OCY. *See id*., at 119-25, 146, 150. She also testified that Erie OCY had made Father and Mother aware "numerous times" that Father should explore obtaining a separate residence due to Mother's

failure to address her mental health or her drug dependency. *Id*. at 127. Ms. Luther also testified that Father had consistently attended partially supervised visitations, but when Father had been allowed one unsupervised visit with the Children, he allowed Mother to remain at that visit after she showed up allegedly unexpectantly, even though Father knew that Mother's presence violated the court's order. *Id*. at 131. Ms. Luther also testified that the Children were progressing well in their current foster care placement. *Id*. at 128.

Father testified that no one from Erie OCY ever gave him an ultimatum to separate from Mother or lose the possibility of reunification. However, he also testified that he was aware at the March 2015 hearing that he would likely have to leave Mother to reunify with the Children. He testified that he had made plans to separate from Mother, but once the dependency court changed the permanency goal to adoption, he decided to remain with Mother. *See* N.T., 3/8/16, at 12-16, 22, 26, 28-19.

The foster/pre-adoptive mother testified that in the year that the Children have been in her home, both Children have stabilized in their development, both have been toilet trained, and both are now developmentally age-appropriate in their speech and education. She also testified that the Children get along well with the other children in the household. Foster mother further stated that when returning from their visits with their parents, the Children were somewhat hyperactive and required some time to settle down. She testified that the Children last

visited with their parents in approximately July 2015 when OCY terminated services due to the goal change. *See* N.T., 1/28/16, at 160-65.

The Children's special education teacher testified that she worked with the Children from August to November 2014 to teach them language and social skills. She stated that in October 2014 she noticed that both Children had regressed in their behaviors.[8] Upon reporting the problem to the foster parent, she learned that the Children's visits with their parents had recently increased. She stated that the Children's developmental improvements remained, but their behavior and life skills went backwards significantly when the visits were increased. *See id.* at 92-93.

By Decree and Opinion filed on October 10, 2016, the Orphans' Court denied the TPR Petitions, concluding that OCY had not met their statutory burden under the Adoption Act. The court focused on the success of the parents' visits with the Children, and stated:

> The record is devoid of evidence the father is unable to meet the children's special needs. The record is devoid of evidence the mother cannot avail herself of services to assist her in meeting the children's needs. Since the children were adjudicated dependent, the parents remained crime-free and by all accounts remained cooperative with service providers.
>
> The record establishes the children are on target developmentally.

---

[8] The teacher testified that on one occasion when M.A.B. was in line, she referred to herself as a "F-ing screw up" and when caretakers told her that was not true, the Child responded, "Momma says." N.T., 1/28/16, at 92.

Family Based Mental Health Services can assist the family with the transition of the children to the care of the parents. Given the parents' progress, the [F]ather's demonstrated stability of long-standing nature, and the continued availability of support services to assist with the transition of the children to the care of the parents, it is in the children's best interests to achieve reunification with the parents.

\*\*\*

The implication the [M]other is not a fit parent for the primary reason she failed to comply with OCY's expectations regarding urinalysis screening is not sufficient to sustain the Petitions to terminate the [M]other's rights under the facts of this case.

TCO, dated 10/10/16, at 37-39.

Both Erie OCY and the Children's Guardian *ad litem* filed the timely appeals, which were consolidated by this Court *sua sponte*. All parties have complied with Pa.R.A.P. 1925.

In these Appeals, Erie OCY and the guardian *ad litem* assert that the Orphan's Court committed an abuse of discretion and/or error of law by concluding that OCY did not establish, by clear and convincing evidence, any ground for termination put forth under Section 2511(a), and in further concluding that termination is not in the Children's best interests pursuant to Section 2511(b).

**Legal Analysis**

In cases involving termination of parental rights, "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child." *In re I.J.,* 972 A.2d 5, 8 (Pa.Super.2009) (citation omitted).

- 14 -

> The party seeking the termination of parental rights bears the burden of proving that grounds for termination exist by clear and convincing evidence. Clear and convincing evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. Although this court has stated that the standard of review for an appellate court in these matters is limited to the determination of whether the trial court's decree is supported by competent evidence, we have also explained that the factual findings of the trial court should not be sustained where the court abused its discretion or committed an error of law. Thus, absent an abuse of discretion or error of law, where the trial court's factual findings are supported by competent evidence, an appellate court must affirm the trial court even though the record could support the opposite result.

*In re R.I.S.*, 36 A.3d 567, 572 (Pa. 2011) (citations omitted). *See also In re Adoption of C.L.G.*, 956 A.2d 999, 1003-04 (Pa. Super. 2008) (*en banc*).

The Adoption Act provides the following with respect to the termination of parental rights:

**23 Pa.C.S. § 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

- 15 -

\*\*\*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\*\*\*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a) and (b).

"Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation omitted). "Initially, the focus is on the conduct of the parent. …. Only if the court determines that the parent's conduct warrants

termination of his [or her] parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (internal citations omitted). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *In re N.A.M.*, 33 A.3d 95, 100 (Pa. Super. 2011). A parent has a duty to work towards reunification by cooperating with the rehabilitative services necessary for him or her to be able to perform parental duties and responsibilities. *In re Adoption of J.J*., 515 A.2d 883, 890 (Pa. 1986).

Significantly, a parent must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent child relationship:

> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (internal citations omitted).

Most importantly, "parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with her physical and emotional needs." *Id.* at 855. Thus, "a parent's basic constitutional right to the custody and

rearing of his [or her] child is converted, upon the failure to fulfill his [or her] parental duties, to the child's right to have proper parenting and fulfillment of [his or] her potential in a permanent, healthy, safe environment." ***Id***. at 856.

Relevant to this case, we note that "the [Orphans'] court in termination proceedings cannot substitute its judgment for that of the juvenile court on the same factual issue." ***In re J.A.S.***, 820 A.2d 774, 781 (Pa. Super. 2003).

Sections 2511(a)(2) and (8) are most relevant to these Appeals. Under Section 2511(a)(2), "the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) [that] such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) [that] the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." ***In re A.S.***, 11 A.3d 473, 479 (Pa. Super. 2010) (citation omitted); ***see also*** 23 Pa.C.S. § 2511(a)(2). The grounds for termination parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. ***In re A.L.D.***, 797 A.2d 326, 337 (Pa. Super. 2002).

Section 2511(a)(8) provides that grounds for termination exist where "[t]he child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child." 23 Pa.C.S. 2511(a)(8). Thus, to terminate parental rights under Section 2511(a)(8), the petitioner must show that "(1) [t]he child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa. Super. 2003).[9]

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.

_____

[9] We disagree with the Orphans' Court's opinion that Section 2511(a)(8) does not apply in the instant case because at the time of their placement, "the [C]hildren were not removed from the care of either parent." TCO at 37. In fact, Father testified that, although Grandmother would care for the Children as part of an agreement with Mother, Mother was "in and out of the picture" and "would come back and sometimes take the children back with her for a little while and then bring them back to" Grandmother's home. N.T., 3/8/16, at 8-9. There was no formal court-sanctioned guardianship agreement with Grandmother. Thus, contrary to the Orphans' Court's assessment, when Grandmother called the Agency because Mother had entered an in-patient facility, the Children were "removed from the care of the parent by the court." 23 Pa.C.S. § 2511(a)(8).

- 19 -

Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond."

*Id*.

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In Re. Z.P.*, *supra* at 1121 (internal citations omitted).

In the instant case, the trial court concluded that Erie OCY had not met its burden under any subsection of Section 2511(a) with respect to either Mother or Father. Our review indicates that the Orphans' Court's conclusions are not supported by law or by the record evidence.

**Mother – Section 2511(a)(2)**

With respect to Mother, the record shows that the OCY met its burden under Section 2511(a)(2). In its Opinion denying the Petition to Terminate Parental Rights, the trial court stated, *inter alia*:

> The mother demonstrated progress in every area that was assessed, including readiness for reunification. Corry Counseling determined that, when its services were discontinued in July, 2015, although the mother made progress, she continued to struggle with certain issues and was not yet ready to be a sole caregiver. Nonetheless, the record establishes there was a reasonable probability the causes and conditions which led to placement could be remedied, and the family could be restored.

TCO, dated 10/10/16, at 34.

This statement is not supported by the record and ignores the Adoption Act's clear delineation of what must be shown at a termination proceeding. The issue is not whether evidence proved that sometime in the future Mother will be able to resolve her issues. *See In Re B.N., M.*, *supra*. Rather, the Adoption Act looks at the situation as it stood at the time of the filing of the termination petition, *i.e.*, whether there exists (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *In re K.Z.S.*, 946 A.2d 753, 760 (Pa. Super. 2008).

It is undisputed that the cause of the Children's placement in February 2014 was Mother's mental health and substance abuse problems. As noted above, at the permanency review hearings that followed the initial placement, Erie OCY demonstrated that although Mother had at first minimally complied with the goals set by the court by obtaining some treatment, over time her compliance dropped off. This lack of compliance ultimately led to Judge Trucilla changing the placement goal to adoption.

By the time of the filing of the termination petition in August 2015, the evidence showed that Mother was not in therapy, had gone off her medications without medical supervision, had failed to show up for court-

ordered urinalyses, and failed to provide documentation from medical professionals to support her excuses for why she had failed to show up and, had obtained a prescription for Suboxone, the very opioid that led to the Children's placement in February 2014.[10]

Although Mother had received some parental education, and up to a certain point had had successful visits with the Children, the evidence showed that Mother refused to address her substance abuse and mental health issues with consistency. By the time OCY filed the petition to terminate Mother's parental rights in August 2015, both the dependency court and the Erie OCY caseworkers had concluded that due to the nature of the Children's special needs and Mother's refusal to address her significant mental health and substance abuse issues with consistency, Mother would be unable to meet the Children's needs in a safe, healthy manner. Thus, the

_____

[10] The Orphans' Court stated that "[t]he veracity of the mother's explanation [for failing to comply with urinalysis] is borne out by the record." TCO at 33. However, Mother did not testify at the termination hearing, and the record shows that Mother failed to provide the medical documentation to support her stated excuses as ordered by the dependency court. The record does not provide support for the Orphans' court's statement.

The Orphans' Court also blames the OCY for not "utilizing the patch program as an alternative to urinalysis screenings for the mother." TCO. at 33. We note that neither Section 2511(a) nor Section 2511(b) requires a court to consider at the termination stage whether an agency provided a parent with reasonable efforts aimed at reunifying the parent with his or her child prior to the agency petitioning for termination of parental rights. *In re D.C.D.*, 105 A.3d 662, 672 (Pa. 2014). An agency's failure to provide reasonable efforts to a parent does not prohibit the court from granting a petition to terminate parental rights under Section 2511. *Id*. at 675.

Orphans' court's conclusions about Mother's compliance and the OCY's opinion on Mother's ability to keep the Children safe are not supported by the record evidence. Her incapacity continues to exist.

In sum, the Orphans' Court's conclusion with respect to Mother is not supported by the record. Rather, the evidence shows that the Erie OCY met its burden by demonstrating "(1) repeated and continued incapacity, … or refusal; (2) such incapacity, … or refusal caused the child to be without essential parental care, control or subsistence; and (3) the causes of the incapacity, … or refusal cannot or will not be remedied." 23 Pa.C.S. § 2511(a)(2); **In re A.S.**, **supra**. **See also In re J.A.S.**, 820 A.2d at 781 (holding that the Orphan's court in termination proceedings cannot substitute its judgment for that of the dependency court on the same factual issue).

**Father – Section 2511(8)**

In order to satisfy Section 2511(a)(8), the OCY must show (1) that the child has been removed from the care of the parent for at least twelve (12) months; (2) that the conditions which had led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child. 23 Pa.C.S.A. § 2511(a)(8). Notably, termination under Section 2511(a)(8), does *not* require an evaluation of a parent's willingness or ability to remedy the conditions that led to placement of his or her children. **See In re Adoption of R.J.S.**, 901

A.2d 502, 511-12 (Pa. Super. 2006) (citations omitted). (discussing and applying each element of subsection(a)(8)).

In the instant case, the Orphans' court concluded that Father had made significant progress in his complying with the goals set by Erie OCY. The evidence notes that Father was no longer incarcerated, worked at two jobs over 50 hours a week, and obtained an apartment appropriate for the Children. The evidence also showed, however, that Father had not attended therapy consistently, had missed urinalysis appointments, and tested positive for marijuana in March 2015.[11] The Orphans' court nonetheless concluded that Father had met each of the goals set by the dependency court.

However, as noted above, the Adoption Act requires the Orphans' Court at a parental rights termination proceeding to determine if the circumstances which led to the Children's removal continued to exist at the time of the filing of the termination petitions. Here, the circumstance which led to the Children's removal in February 2014, the continuation of their

_____

[11] Although the trial court states "[d]uring the period from February 26, 2015 to August 26, 2015, [F]ather demonstrated no less than substantial compliance with the reunification orders …," **see** TCO., dated 10/10/16, at 30, the dependency court orders entered into the record indicate Father's compliance and progress were moderate in March 2015 and minimal in July 2015. Erie OCY Exh. 6. In addition, although Father testified that he was unable to comply with his urinalysis requirements because of work, there was also testimony presented that Father had been laid off for 2 or 3 weeks in 2014 and still failed to show up for urinalyses. **See** N.T., 3/8/16, at 12-13.

placement throughout 2014 and 2015, and the filing of the termination petition in August 2015, was their exposure to Mother's substance abuse and untreated mental health issues and Mother's inability to comply with treatment goals.

As noted above, our review of the record does not support the trial court's conclusion that Mother had made meaningful progress in alleviating the circumstances which led to the children's removal. Thus, the circumstance which led to the removal of the Children, *i.e.*, Mother's substance abuse and mental health issues, which put the Children's emotional and physical safety at risk, continued to exist. At the time of the filing of the termination petition, Father continued to live with Mother. His refusal to leave Mother puts the Children at risk. Accordingly, the circumstance which led to the Children's removal continued to exist with respect to Father.

We are mindful that the application of Section (a)(8) may seem harsh when a parent has made significant progress in attaining goals that would permit reunification to go forward.

> However, by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen (18) months, in which to **complete** the process of

either reunification or adoption for a child who has been placed in foster care.

***In re Adoption of R.J.S.***, 901 A.2d at 513.

Significantly, Father testified that he knew in March 2015, over a year after the Children's placement, that he would have to obtain housing separate from Mother in order to be reunited with his Children. ***See*** N.T., 3/8/16 at 22, 26. Father also agreed that Mother had "had little or no compliance with the directives which she was supposed to go through[,]" ***id***. at 27, 38, and testified that he had separated from Mother for about 1½ weeks in July after learning that there was a hearing scheduled to change the goal to adoption, but once the goal was changed to adoption, he and Mother again moved back together because he "could try and still work with her since they had tried to eliminate the children out of my life." ***Id***. at 29. On March 8, 2016, when the Children had been in care for over two years, Father testified at the termination hearing that he continued to live with Mother. ***Id***. at 29-30.

Father refused to put his children's needs ahead of Mother's and his own needs by obtaining housing without Mother, while Mother showed minimal efforts to address her substance abuse and mental health issues. It is for that reason that Judge Trucilla sitting as dependency court changed the permanency goal from reunification to adoption. The same evidence of record that the dependency court relied on in changing the goal from reunification to adoption, combined with the testimony about that evidence

presented to Judge Brabender sitting as Orphans' Court, provided clear and convincing evidence that the Children had been removed from the care of the parent for at least twelve months, and that the conditions which had led to the removal or placement of the Children still exist. *See* 23 P.C.S. § 2511(a)(8); *In re J.A.S.*, 820 A.2d at 781 (stating "the [Orphans'] court in termination proceedings cannot substitute its judgment for that of the juvenile court on the same factual issue.").

The third element of Section 2511(a)(8) requires that the Orphans' Court conduct an analysis similar to that required under Section 2511(b), *i.e.*, that termination of parental rights would best serve the needs and welfare of the child. We, thus, discuss the Orphans' Courts determination on this issue below.

**Father and Mother – Section 2511(b)**

Section 2511(b) requires the Orphans' Court to consider "[i]ntangibles such as love, comfort, security, and stability … when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *In re C.P.*, 901 A.2d at 520. **See also *In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (same); ***In re Adoption of G.L.L.***, 124 A.3d 344, 349 (Pa. Super. 2015) (noting that the Orphans' court must analyze whether the relationship with the parents is "necessary and beneficial.") (citation omitted)). The extent of the bond-effect analysis

- 27 -

necessarily depends upon the unique facts and circumstances of the particular case. *In re K.Z.S.,* 946 A.2d at 763.

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. The mere existence of an emotional bond does not preclude the termination of parental rights. Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.,* 835 A.2d 387, 397 (Pa.Super.2003). . . . In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court [has] stated that **the trial court should consider the importance of continuity of relationships** and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d at 103 (some citations and quotation marks omitted) (emphasis added).

With respect to Section 2511(b), the Orphans' Court in the instant case concluded as follows:

> All indications from the evidence are that the children know the parents, they enjoy visiting with them, and they are bonded to the parents. By all accounts, visitation between the children and the parents went well. The children enjoyed and looked forward to visitation. … The children did not act out or demonstrate adjustment behaviors in the parents' care. The OCY caseworkers and the Corry Counseling Family Preservation program … had no concerns whatsoever regarding how supervised and unsupervised visitation went, and the safety and well-being of the children in the parents' care.

TCO at 38.

This conclusion fails to address adequately the issues that must be considered under Section 2511(b). While there was evidence presented by supervising caseworkers that visits had gone well, in a termination proceeding the Orphans' Court is required to determine whether a beneficial bond exists and whether the termination of that bond will have a detrimental effect on the Children. The possibility of a positive parent-child bond is suggested by the Orphans' Courts' observation that the record showed that "the children know the parents, enjoy visiting with them, and are bonded to [them]," and that "the children became excited when they thought [M]other was telephoning them." TCO at 33. However, notwithstanding the statement by the Orphans' Court that the Children are bonded to the parents, there was little evidence presented at the termination hearing that directly addressed the presence or absence of a significant bond, the termination of which would be detrimental to the Children. Moreover, the Orphans' Court failed to acknowledge the little evidence that *was* presented that addressed the Section 2511(b) bond issue.

For instance, Kim Covatto, the Children's Eric OCY Permanency caseworker since October 2015, testified that based on her observations of the Children in their foster homes, the length of time they have been separated from their parents, the fact that the Children never ask to see their parents, and the bonds the Children have in their current home, there

would be no detrimental impact on the Children if the parental rights were terminated.  *See* N.T., 1/28/16, at 179-181.

In addition, the Children's special education teacher testified regarding the progress that the Children had made since being placed in foster care, and the regression that occurred in October 2014 when visitation with the parents began.  *See* N.T., 1/28/16, at 87-95, 99, 162-65.  Further, the foster/pre-adoptive mother testified regarding the progress the Children had made over the past 12 months during which they lived in her home, and stated that the Children refer to her and her husband as "Mom" and "Dad," and to Mother and Father by their first names.  *Id*. at 66.[12]

Thus, although there was some testimony that would tend to show the existence of a bond, and specific testimony on the termination of that bond that the Orphans' Court completely ignored, we are constrained to remand to the Orphans' Court to conduct further proceedings pursuant to 23 Pa.C.S. §2511(b) and relevant case law.  The court should specifically consider that a child develops a meaningful bond with a caretaker when the caretaker provides stability, safety, and security regularly and consistently to the child over an extended period of time.  We direct the court to consider these factors when analyzing "the [i]ntangibles such as love, comfort, security, and stability," "the nature of the status of the parent-child bond," if any, and

_____

[12] Foster/pre-adoptive mother also testified that Mother had telephoned her three days before the termination hearing to ask how the kids were, but prior to that, she had not heard from either Mother or Father in over a year.

"the effect on the [C]hild[r]en of permanently severing that bond." ***In re***

***C.P.***, ***supra*** at 520; ***In re N.A.M.***, 33 A.3d at 103.

Decrees reversed. Case remanded for further proceedings consistent with this Opinion. Jurisdiction relinquished.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/29/2017