J-A18041-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: E.B., A/K/A<br>E.J.B., A MINOR | : : : : : : : : : | IN THE SUPERIOR COURT OF<br>PENNSYLVANIA |
| APPEAL OF: R.B., FATHER | : | No. 680 EDA 2018 |

Appeal from the Decree February 5, 2018
in the Court of Common Pleas of Philadelphia County
Family Court at No(s):   CP-51-AP-0000876-2017
CP-51-DP0000013-2016
FID: 51-FN-000014-2016

BEFORE:   STABILE, J., STEVENS, P.J.E.* and STRASSBURGER, J.**

MEMORANDUM BY STRASSBURGER, J.:          **FILED OCTOBER 31, 2018**

R.B. (Father) appeals from the decree entered February 5, 2018, which terminated involuntarily his parental rights to his minor son, E.B. (Child), born in December 2015.[1]  Father's notice of appeal also challenges

---

[1] Philadelphia Department of Human Services, Child and Youth Division (DHS) also filed a petition to terminate involuntarily the parental rights of Child's mother, A.J. (Mother).  The family court continued the combined goal change/termination of parental rights hearing as to Mother to provide Mother, who was incarcerated, with an opportunity to testify.  The record does not reveal the outcome of that continued hearing.  Mother did not participate in this appeal.

* Former Justice specially assigned to the Superior Court.

** Retired Senior Judge appointed to the Superior Court.

the order purportedly changing Child's permanency goal to adoption.[2]  We

affirm.

On December 28, 2015, shortly after Child's birth, DHS

received a General Protective Services ([GPS]) report [alleging that Mother], Father, and Child resided in a home that was dirty with illegally connected utilities; domestic violence existed between Mother and Father; police were frequently called to the home; Child may have fallen on the floor during an altercation

---

[2] Despite Father's assertion to the contrary, the February 5, 2018 permanency review order did not change Child's permanency goal to adoption.  Permanency Review Order, 2/5/2018, at 1 (stating goal remained return to parent).  We presume this is because the family court continued the combined goal change/termination of parental rights hearing as to Mother.  Father filed one notice of appeal purporting to challenge both the termination decree and the February 5, 2018 permanency review order, and included the docket numbers for Child's dependency and adoption matters.  The correct procedure in this circumstance is to file separate notices of appeal for each docket.  *See* Pa.R.A.P. 341, Note ("Where … one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed.").  In a recent case, our Supreme Court held that the failure to file separate notices of appeal from an order resolving issues on more than one docket "requires the appellate court to quash the appeal."  *Commonwealth v. Walker*, 185 A.3d 969, 977 (Pa. 2018).  However, the Court clarified that it would apply its holding only "in future cases."  *Id.*  Thus, because Father filed his notice of appeal prior to the filing of our Supreme Court's decision in *Walker*, we do not quash his appeal.

However, Father has waived all arguments with respect to the February 5, 2018 permanency review order.  Father's brief on appeal contains no substantive discussion of any issue pertaining to a change in Child's permanency goal in the dependency matter.  Accordingly, Father has failed to preserve any challenge to the permanency review order for our review, and we address only the decree terminating Father's parental rights. *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) ("Where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.").

between Mother and Father; [and] two adult females and three adult males lived in the home along with Mother, Father, and Child. DHS visited the family home on December 28, 2015. Father answered the door and denied the allegations of the GPS report, denied knowing anything about a baby when asked questions about Child, and [] claimed he did not know Mother. Father allowed DHS to enter the home and DHS observed that there was no infant or any infant supplies in the home. … On December 29, 2015, DHS contacted [the hospital where Child was born] and learned that Father was Child's father, Mother and Father were not prepared to care for Child, and Mother and Father lacked clothing and supplies for Child. On December 29, 2015, DHS visited the family home again. Father was observed walking toward the home, but Father refused to permit DHS into the home. Father claimed that he did not know where Mother and Child were. DHS informed Father that court involvement would be initiated if he failed to cooperate with the DHS investigation. On December 30, 2015, Father called DHS and stated that Mother and Child were residing with [Child's paternal aunt (Paternal Aunt)]. DHS visited Paternal Aunt's home on December 30, 2015, and DHS observed Mother and Child in the home. Child was safe and being cared for at that time. …

On January 5, 2016, Father contacted DHS and stated that Mother had made statements that she was thinking about absconding with Child. DHS obtained an [order of protective custody] for Child, and Child was placed in foster care…. At the shelter care hearing, the [order of protective custody] was lifted and the temporary commitment to DHS was ordered to stand. On January 14, 2016, the [family] court adjudicated Child dependent [pursuant to the Juvenile Act] and fully committed Child to DHS['s custody].

Family Court Opinion, 4/19/2018, at 1-2 (footnotes omitted).

On September 1, 2017, after Child had been in foster care for almost two years and eight months, DHS filed a petition to terminate Father's parental rights involuntarily. The family court conducted a termination

hearing on February 5, 2018.[3] Father did not attend the hearing, but was represented by counsel.[4] Following the hearing, the family court entered a

_____

[3] The family court appointed legal counsel to represent Child in compliance with 23 Pa.C.S. § 2313(a). Child also had the benefit of a guardian *ad litem*. Both Child's legal counsel and guardian *ad litem* stated their agreement with DHS's position at the conclusion of the hearing. N.T., 2/5/2018, at 51. The record indicates that Child was just over two years old and non-verbal at the time of the hearing, which rendered Child unable to articulate a preferred outcome. ***See In re T.S.***, ____ A.3d ____, 2018 WL 4001825 at *10 (Pa. filed August 22, 2018) (distinguishing two- and three-year-old children whose young age rendered them unable to form a "subjective, articulable preference" from "children as young as five or six years of age [who have] opinions which are entitled to weight in legal proceedings concerning their custody").

We note with disapproval that neither Child's legal counsel nor guardian *ad litem* filed a brief advocating for Child's interests, or indicated that Child was joining another party's brief. "Counsel's duty to represent a child does not stop at the conclusion of the termination of parental rights hearing." ***In re Adoption of T.M.L.M.***, 184 A.3d 585, 590 (Pa. Super. 2018); ***see also In re M.T.***, 607 A.2d 271, 276 (Pa. Super. 1992) (observing that child's counsel abdicated his legal responsibilities to his client because counsel, *inter alia*, failed to file a brief, indicate that he joined another party's brief, or otherwise notify this Court of his client's position).

[4] Mary Ann Galeota, Esquire, is Father's court-appointed counsel. Prior to the termination hearing, Attorney Galeota filed a motion to withdraw and presented it to the family court on the day of the hearing, stating that Father instructed her to do so. N.T., 2/5/2018, at 6-10. Because Father failed to appear at the hearing despite notice, the family court did not rule on the motion. The family court instructed Attorney Galeota to continue in her representation of Father by cross-examining witnesses but without taking a position on Father's behalf. ***Id.*** Attorney Galeota continues to represent Father on appeal, and Father raises no challenge to her representation.

While we could construe Father's failure to take a formal position at the conclusion of the hearing as a failure to preserve his issues for appeal, the tenor of Attorney Galeota's cross-examination indicated that Father opposed
*(Footnote Continued Next Page)*

decree terminating Father's parental rights. Father timely filed a notice of appeal. Both Father and the family court complied with Pa.R.A.P. 1925.

Father now raises the following claims for our review.

[1.] Did the [family] court err when it found that [DHS] had met its burden by clear and convincing evidence to terminate [Father's] parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(1), § 2511(a)(2), § 2511(a)(5), § 2511(a)(8), § 2511(b)?

[2.] Did the [family] court err when it failed to consider whether [DHS] made reasonable efforts to reunify [Child] with Father?

Father's Brief at 5.

We review the decree terminating Father's parental rights involuntarily under the following standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

*(Footnote Continued)* ───────────────

the termination petition. In an abundance of caution, we will address Father's issues on appeal as if preserved.

Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, governs involuntary termination of parental rights. It requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [subs]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [subs]ection 2511(b): determination of the needs and welfare of the child[.]

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the family court terminated Father's parental rights pursuant to subsections 2511(a)(1), (2), (5), (8), and (b). We need only agree with the court as to any one subsection of 2511(a) as well as subsection 2511(b) in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's decision to terminate pursuant to subsections 2511(a)(2) and (b), which provide as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> ***

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

> ***

- 6 -

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

We address first whether the trial court abused its discretion by terminating Father's parental rights pursuant to subsection 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted).  "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct.  To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties."  *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

In its opinion, the family court concluded that DHS presented clear and convincing evidence in support of its petition to terminate Father's parental

rights pursuant to subsection 2511(a)(2). Family Court Opinion, 4/19/2018, at 7-9. The family court noted that Father was largely uncooperative with services offered to him throughout Child's lengthy stay in foster care, resulting in Father not making progress on any of his court-ordered goals. Thus, in the family court's view, Father had demonstrated that he is unwilling to remedy the causes of his incapacity to parent in order to provide Child with essential parental care, control, or subsistence necessary for Child's physical and mental well-being. *Id.* at 9.

Father argues that he has taken "novel steps towards completing" his court-ordered goals and "was working towards remediation of the conditions" that led to Child's placement. Father's Brief at 12-13. He contends he secured a job and home in another state, scheduled mental health services, a parenting capacity evaluation, and anger management classes in Illinois, and "was in the process of stabilizing his life … so that [Child] could be in a position to achieve permanency." *Id.* at 13.

After a careful review of the record, we discern no abuse of discretion by the family court. The record reveals that shortly after Child's birth, DHS received allegations of domestic violence between Father and Mother, inadequate housing for Child, and Father and Mother's unpreparedness to parent a newborn baby. Father refused to cooperate with DHS's investigation of the GPS report. Shortly thereafter, DHS removed Child after Father accused Mother of threatening to abscond with Child. The family

court did not place Child with Father at that time. Instead, the family court adjudicated Child dependent based upon Mother and Father's present inability to parent, and ordered Father to undergo a parenting capacity evaluation and participate in reunification services through the Achieving Reunification Center (ARC) program. DHS Exhibit 6 at 1-2. The family court permitted Father to attend supervised visits with Child once per week. *Id.*

Although Father initially enrolled in ARC's program on February 9, 2016, ARC subsequently closed the referral due to Father's lack of participation. Father visited Child but declined ARC's anger management services and parenting education services, leading the family court to evaluate his compliance as minimal at the April 2016 permanency review hearing. DHS Exhibit 7 at 1-2. The family court ordered Father to undergo a behavioral health evaluation and to complete anger management and family school. DHS Exhibit 7 at 1-2.

From that point forward, Father did not attend any subsequent permanency review hearings. DHS Exhibit 8-10. He also continued to refuse to participate in court-ordered services, resulting in findings of no compliance by the family court in Child's dependency matter. *Id.*

Specifically, Father failed to show up for eight parenting capacity evaluations. N.T., 2/5/2018, at 21, 41-42. Father started but did not complete family school. *Id.* at 28. He also never completed a psychiatric evaluation with Behavioral Health Services (BHS). *Id.* at 25. He visited

BHS once, but had to be escorted out of the office due to his irate behavior. *Id.* Father claimed he completed a psychiatric evaluation elsewhere, but that facility informed the Community Umbrella Agency (CUA) social worker assigned to Father's case that they had no record of such evaluation. *Id.* at 27-28.

Father also claimed to have taken some anger management classes, but he did not provide documentation to the CUA social worker, and never completed a program despite being court-ordered to do so. *Id.* at 16, 22-24, 30-31. Moreover, Father continued to display a lack of progress with his anger management, as demonstrated by his continued harassment of the former CUA case manager. Father referred to the CUA case workers as "bitches" and threatened one of them, telling her that he knows where she lives and could find her if she did not get Child back to him. *Id.* at 23-24. Father has badgered Child's foster parent with texts. *Id.* at 33. Father's failure to control his anger led to the family court ordering Father to refrain from threatening and harassing any of the persons involved with the case. DHS Exhibit 10.

Additionally, Father's housing has been unstable. *Id.* at 18, 40. He provided the CUA social worker with two addresses in Philadelphia, but mail was returned from each. *Id.* at 26. At some point in 2017, Father moved to Illinois suddenly without informing the CUA social worker. *Id.* at 26. He also has not maintained stable employment. *Id.* at 18.

Father's unstable behavior has impacted his parenting of and contact with Child. Father never progressed to unsupervised visitation with Child because of his lack of stability and inconsistency with visiting Child. N.T., 2/5/2018, at 19. At the beginning of the case, Father visited Child weekly. DHS Exhibit 7. In December 2016, the family court reduced Father's visits to bi-weekly. DHS Exhibit 8. In March 2017, the family court changed Father's visits to monthly, with required confirmations 24 hours in advance and on the day of the visit. DHS Exhibit 9. In June 2017, the family court suspended Father's visits altogether until he complied with the court's orders to undergo a BHS psychiatric evaluation and anger management classes. DHS Exhibit 10. Father's last visit with Child occurred around June 2017, about seven months prior to the TPR hearing. *Id.* at 25.

Based on this evidence, the record supports the family court's finding that Father cannot or will not remedy the causes of his repeated and continued incapacity and/or refusal to parent, which has caused Child to be without essential parental care, control or subsistence necessary for Child's physical and mental well-being. Concerns about Father's housing, anger, and parenting have existed since the inception of the case. Father refused to cooperate with DHS's investigation prior to Child's removal, and he largely refused to participate in services despite court orders requiring him to do so in order to reunify with Child. Father abruptly moved hundreds of miles away from Child without notice. By the time of the hearing in this matter,

Child had spent two years of his life in foster care, and Father remained in no position to provide for any of Child's needs. Father concedes that he still had not remedied his issues after two years. *See* Father's Brief at 12-13. Even if Father had scheduled various services in Illinois as he contends, he has scheduled services before and failed to participate. Moreover, Father only scheduled the parenting capacity evaluation and anger management classes one week prior to the TPR hearing. N.T., 2/5/2018, at 43-44.

Father made no progress over two years while Child aged from an infant to a toddler. As this Court has emphasized, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *R.J.S.*, 901 A.2d at 513. Therefore, we conclude that the family court did not abuse its discretion by terminating Father's rights pursuant to subsection 2511(a)(2).

We next consider whether the family court abused its discretion by terminating Father's parental rights pursuant to subsection 2511(b). The focus of subsection 2511(b) is exclusively on the child. *In re M.T.*, 101 A.3d 1163, 1181 (Pa. Super. 2014) (*en banc*). Judicial inquiry of the needs and welfare of the child examines "the effect of [the parent's] actions or omissions upon the child" to determine whether the parent is meeting the

child's developmental, physical, and emotional needs. *In Interest of Coast*, 561 A.2d 762, 767 (Pa. 1989) (*en banc*).

"[Subs]ection 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act." *In re Adoption of J.N.M.*, 177 A.3d 937, 944 (Pa. Super. 2018). However, case law requires the court to determine whether the parent and child have an emotional bond, the nature of such a bond, and the effect upon the child of permanently severing the bond. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "The mere existence of an emotional bond does not preclude the termination of parental rights." *In the Matter of the Adoption of M.A.B.*, 166 A.3d 434, 448 (Pa. Super. 2017). Rather, courts must examine whether termination of parental rights "would destroy an existing, necessary and beneficial relationship," *In re K.Z.S.*, 946 A.2d 753, 760 (Pa. Super. 2008), and whether severance of a bond would cause the child "to suffer 'extreme emotional consequences.'" *In re Adoption of J.N.M.*, 177 A.3d 937, 944 (Pa. Super. 2018) (citing *In re E.M.*, 620 A.2d 481, 484-85 (Pa. 1992)).

While the bond between parent and child is a major aspect of the subsection 2511(b) analysis, it is nonetheless only one of many factors to be considered by the court when determining whether termination serves the child's needs and welfare. *M.A.B.*, 166 A.3d at 448. Courts may "equally emphasize the safety needs of the child." *Id.* Courts should also consider

"the love, comfort, security, and stability the child might have with the foster parent." *Id.*

The family court determined that termination of Father's parental rights serves Child's needs and welfare for the following reasons. There is no existing, necessary, and beneficial relationship between Father and Child, and Child would not suffer irreparable harm if the court terminated Father's rights. Family Court Opinion, 4/19/2018, at 15. Child has been in foster care almost his entire life, and Father failed to create a bond with Child through visitation. *Id.* Child is safe with his current foster parents, who are meeting his needs. *Id.* CUA is searching for a pre-adoptive home for Child, and it serves his needs and welfare to be adopted. *Id.*

Father's argument regarding Child's needs and welfare is brief. He argues that Father tried desperately to reach out to Child, and his attempts to connect with Child are evidence there is a bond between Father and Child. Father's Brief at 13. Father posits that DHS and the family court misinterpreted his desperate attempts as anger when it was really sadness. *Id.* He also emphasizes that he lived out-of-state and did not have resources to pay for transportation. *Id.*

After review, we conclude that the record amply supports the family court's findings and conclusions. Whether Father attempted to connect with Child is not the pertinent inquiry, as "a parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights."

- 14 -

*In re T.M.T.*, 64 A.3d 1119, 1128 (Pa. Super. 2013). The real issue is whether there is an existing, necessary, and beneficial relationship between Father and Child, and the effect upon Child of severing such a relationship. Child was a very young infant when he came into foster care. Child has been in foster care for all but two weeks of his young life. The only contact between Child and Father was during supervised visits, and Father failed to visit consistently. In fact, seven months elapsed without Child seeing Father at all, while Child aged from approximately one and a half to two years old in the secure care of his foster parents. Furthermore, Child's behaviors have not declined during Father's absence from his life. N.T., 2/5/2018, at 20. Under the circumstances, it was reasonable for the family court to conclude that Father and Child do not share a necessary and beneficial bond, and Child would not suffer extreme emotional consequences upon termination of Father's rights. *See K.Z.S.*, 946 A.2d at 764 (observing that the relationship between K.Z.S. and his mother "must be fairly attenuated," given that K.Z.S. had been in foster care most of his young life, and that he had only limited contact with his mother during that time).

Although Child's current foster home is not pre-adoptive, at the time of the termination hearing CUA was searching for a pre-adoptive home for Child. The family court found adoption to be in Child's best interest. Family Court Opinion, 4/19/2018, at 15. Father does not argue, and there is nothing in the record to suggest, that Child, now age three, does not have a

"strong likelihood of an eventual adoption."[5]  ***T.S.M.***, 71 A.3d at 270. Terminating the parental rights of Father, with whom Child does not share an existing, necessary, and beneficial relationship, will permit Child to obtain security and permanency through adoption.  Thus, we discern no abuse of discretion or error of law in the family court's conclusion that terminating Father's parental rights would best serve Child's needs and welfare.

We turn now to Father's final issue: his argument that the family court erred by terminating his parental rights when DHS failed to make reasonable efforts to reunify Father and Child.  Father's Brief at 14.  Father contends that DHS failed to provide him with transportation costs to visit and attend hearings, and left him to his own devices in another state while he attempted to accomplish his goals. ***Id.***

Father's argument is unavailing.  The family court found that DHS made reasonable efforts to comply with the permanency plan at every permanency review hearing, findings that Father has never appealed. ***See In re J.A.S.***, 820 A.2d 774, 781 (Pa. Super. 2003) ("[T]he orphans' court in termination proceedings cannot substitute its judgment for that of the juvenile court on the same factual issue.").  The record does not reveal the reason for Father's move out-of-state or the exact date, but the record is

---

[5] The record indicates that the continued hearing on DHS's termination of parental rights petition as to Mother was scheduled for after the date the record was transmitted to this Court.

clear that Father failed or refused to participate with the services DHS offered long before he chose to move out-of-state, hundreds of miles away from Child. Father did not even inform DHS that he had moved, which begs the question of how he expected DHS to have done more.

Even assuming *arguendo* that DHS failed to make reasonable efforts towards reunification, the court may still terminate parental rights if the agency otherwise proves by clear and convincing evidence the existence of grounds and that termination best serves a child's needs and welfare. ***In re D.C.D.***, 105 A.3d 662, 675 (Pa. 2014). DHS has done so in this case. Father had every opportunity to attempt to reunify with Child, and was offered the necessary services to do so, but simply made no progress over the over two years Child was in foster care.

Based on the forgoing, we conclude that the family court did not abuse its discretion or err as a matter of law in terminating Father's parental rights, and Father waived any challenge to the February 5, 2018 permanency review order. Therefore, we affirm the February 5, 2018 decree and order.

Decree affirmed. Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/31/18