J-A22019-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J. G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1442 WDA 2022 |

Appeal from the Order Entered November 7, 2022
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000053-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: A.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1443 WDA 2022 |

Appeal from the Order Entered November 7, 2022
In the Court of Common Pleas of Allegheny County Orphans' Court
at No(s): CP-02-AP-0000054-2022

BEFORE:  BOWES, J., OLSON, J., and KING, J.

MEMORANDUM BY OLSON, J.:                    **FILED:  December 4, 2023**

J.G. ("Mother") appeals the November 7, 2022 orders involuntarily terminating her parental rights to her biological son, K.D., Jr., born December 2012, and her daughter, A.D., born January 2014 (collectively, "the Children").[1]  After careful review, we affirm.

---

[1]  In the same orders, the orphans' court also involuntarily terminated the parental rights of K.D. ("Father") as to the Children.  He did not appeal.

We gather the relevant factual and procedural history of this matter from the certified record. The Allegheny County Office of Children, Youth and Families ("CYF") first became involved with Mother in January 2015, when CYF provided services to assist her and the Children in obtaining housing and, thereafter, closed their case. *See* N.T., 10/28/22, at 115. CYF became involved with the family again in May 2020, however, after receiving reports of troubling activities occurring within the home. Specifically, CYF became aware of allegations of sexual and physical abuse perpetrated against the Children by Mother and her paramour, R.K., as well as heroin use and related criminal behavior by Mother. *See* Shelter Care Order, 6/3/20, at 2; N.T., 10/28/22, at 116. Contemporaneously, multiple complaints concerning Mother's and R.K.'s alleged abuse of the Children were submitted to ChildLine. *See* N.T., 10/28/22, at 118.

On May 29, 2020, the trial court awarded CYF emergency protective custody of the Children, who were initially placed with their paternal grandmother. At the June 3, 2020 shelter care hearing, the trial court determined that the Children's placement should continue. In June 2020, the Children were committed to the physical care of A.H. and J.H. ("Foster Parents"), who are considered to be an adoptive resource for the Children. *See id*. at 25, 146. The Children were adjudicated dependent in August 2020.

Mother's initial permanency goals were to undergo drug and alcohol assessments, submit to random narcotics' screens, resolve her pending

criminal charges, participate in parenting classes, undergo a mental health evaluation, and participate in visitations with the Children. *See* Shelter Care Order, 6/3/20, at 2; N.T., 10/28/22, at 119, 122. Additionally, we note that R.K. was ordered to have no contact with the Children, which order has remained in place for the entirety of these proceedings. *See* Order of Adjudication and Disposition, 8/26/20, at 2; Order, 10/24/22, at 4.

The Children began to undergo individualized therapy beginning in August 2020 with Michael Van Ness. *See* N.T., 10/28/22, at 68-69. The Children also participated in multiple, individual sessions with licensed psychologist Terry O'Hara, Ph.D., who prepared three separate reports of his observations between February 2021 and October 2022. *See id*. at 9. From his observations during therapy, Mr. Van Ness concluded that the Children had suffered "trauma" in Mother's home and still harbored significant fear of reprisals from both Mother and R.K. *See id*. at 72-73, 77. Dr. O'Hara similarly reported that A.D. made specific and "detailed allegations" of physical and sexual abuse perpetrated by both Mother and R.K. *See id*. at 13. K.D. disclosed to Dr. O'Hara that Mother had physically abused him on multiple occasions. *See id*. at 11-12.

On March 25, 2021, one of the ChildLine complaints was found to be indicated against both Mother and R.K. for "causing sexual abuse or exploitation of a child through any act or failure to act." *See id*. at 133. Despite the no contact order entered by the trial court, the record reflects that

- 3 -

R.K. and Mother are still living together. We also note that R.K. and Mother are now married and became parents after Mother gave birth to another daughter in September 2022, who was removed from Mother's care immediately after her birth. *See id*. at 8, 104-05, 216.

In the permanency review orders entered between November 2020 and October 2022, Mother was deemed to be in moderate compliance with the trial court's directives, in that she completed parenting classes, resolved her criminal charges, submitted to most of her random drug screens, and generally maintained her sobriety aside from methadone management. During this same time period, Mother also participated in regular, supervised visits with the Children. Initially, Mother had three supervised visits per week. *See* Shelter Care Order, 6/3/20, at 3. These supervised visitations were decreased to twice per week in November 2020, and further decreased to once per week in March 2021. Ultimately, visits were ceased altogether in approximately July 2022 based upon additional disclosures of abuse made by A.D. to Mr. Van Ness. *See* Permanency Review Order, 10/13/22, at 3; Order Granting Motion to Suspend Visits, 7/19/22, at 1 (unpaginated).

Although Mother was largely successful in addressing her substance abuse and parenting concerns, she did not undergo a mental health evaluation until she met with Dr. O'Hara in 2021. *See* N.T., 10/28/22, at 123. Thereafter, she failed to follow-through with the resulting therapeutic

recommendations until she enrolled in treatment with South Western Pennsylvania Human Services on April 5, 2022. ***See id***. at 123-24.

On April 13, 2022, CYF filed petitions in the orphans' court seeking to involuntarily terminate Mother's parental rights to the Children.[2] The orphans' court held a consolidated hearing on the petitions on October 28, 2022, wherein CYF adduced testimony from, *inter alia*, Dr. O'Hara, Mr. Van Ness, and the CYF caseworker assigned to Mother's case, Erin Burzynski. Mother, R.K., and Father also appeared and testified. On November 7, 2022, the orphans' court filed orders involuntarily terminating Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).

On December 7, 2022, Mother filed timely notices of appeal to this Court along with concise statements of errors pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). Thereafter, the orphans' court filed a responsive opinion pursuant to Rule 1925(a)(2)(ii) explaining its rationale. This Court has consolidated these cases *sua sponte* pursuant to Pa.R.A.P. 513.

Mother has raised the following issue for our consideration: "Did the trial court err in terminating [Mother's] parental rights?" Mother's Brief at 4. A review of Mother's brief reveals that she has essentially challenged the

---

[2] On June 15, 2022, the orphans' court appointed counsel to represent the legal interests of the Children pursuant to 23 Pa.C.S.A. § 2313(a). ***See*** Order Appointing Legal Counsel, 6/15/22, at 1. The same order also made a finding that "no conflict exists" with respect to the Children's interests. ***Id***.

holdings pursuant to Section 2511(a) and (b).  ***See id***. at 19, 29.  We will

address Mother's arguments, in turn.

> Our standard of review in this context is well-settled:
>
> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence.  When applying this standard, the appellate court must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record.  Where the orphans' court's factual findings are supported by the evidence, an appellate court may not disturb the orphans' court's ruling unless it has discerned an error of law or abuse of discretion.
>
> An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result.  Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.
>
> In considering a petition to terminate parental rights, the orphans' court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support.  Termination of parental rights has significant and permanent consequences for both the parent and child.  As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

***Interest of M.E.***, 283 A.3d 820, 829-30 (Pa. Super. 2022) (internal citations

and quotation marks omitted).

The involuntary termination of parental rights is governed by Section

2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses

upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id*. at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under at least one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). This Court need only agree with the orphans' court's determination as to "any one subsection of [Section] 2511(a), in addition to [Section] 2511(b), in order to affirm the termination of parental rights." *T.S.M.*, *supra* at 267.

Since we need only agree with the orphans' court findings as to one of these subsections in addition to Section 2511(b), our analysis will focus upon Section 2511(a)(8) and (b), which provides as follows:

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . . .

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental,

- 7 -

physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

In order to satisfy Section 2511(a)(8), the petitioner must prove that: (1) the child has been removed from the parent's care for at least 12 months; (2) the conditions which led to the removal or placement still exist; and (3) termination of parental rights would best serve the needs and welfare of the child. *See In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa. Super. 2018). Section 2511(a)(8) does not necessitate an evaluation of a parent's willingness or ability to remedy the conditions that led to the removal of the child. *See In re M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017).

Rather, our inquiry is focused upon whether the at-issue "conditions" have been "remedied" such that "reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009). Thus, the statute recognizes "that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of

progress and hope for the future." *Id.* at 11-12 (internal citations and quotation marks omitted). Finally, this Court has also explained that,

> while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*).

If a petitioner establishes adequate grounds for termination pursuant to Section 2511(a), we then turn to Section 2511(b), which requires that the court "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). "Notably, courts should consider the matter from the child's perspective, placing [his/her] developmental, physical, and emotional needs and welfare above concerns for the parent." *In the Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023). This determination "should not be applied mechanically," but "must be made on a case-by-case basis," wherein "the court must determine each child's specific needs." *Id.* at 1106. Accordingly, there is no "exhaustive list" of factors that must be considered in this context. *Id.* at 1113 n.28.

Nonetheless, our Supreme Court has mandated that a court's Section 2511(b) analysis must include "consideration of the emotional bonds between the parent and child." *T.S.M.*, *supra* at 267. Thus, the court must determine whether the "trauma" caused by sundering the parent-child bond is "outweighed by the benefit of moving the child toward a permanent home."

- 9 -

*Id*. at 253 (cleaned up). The recognized threshold for this finding is that the court must determine whether termination will sever a "necessary and beneficial relationship," such that the child "could suffer extreme emotional consequences." ***K.T.***, ***supra*** at 1110. Our Supreme Court has emphasized, however, that such consequences must constitute more than mere proof of "an adverse or detrimental impact from severance of the parental bond" in order to preclude termination. ***Id***. at 1113.

Our case law reflects that a court's analysis pursuant to Section 2511(b) is not narrow but must include consideration of "intangibles such as love, comfort, security, and stability." ***T.S.M.***, ***supra*** at 267. Indeed, our Supreme Court has affirmed that "the parental bond is but one part of the overall subsection (b) analysis." ***K.T.***, ***supra*** at 1113. Thus, "courts must not only consider the child's bond with the biological parent, but also examine the . . . love, comfort, security, and stability the child might have with the **foster** parent." ***K.T.***, ***supra*** at 1111 (emphasis in original; internal citations and quotation marks omitted). Thus, courts should also consider factors that naturally arise due to the particular facts of a case, such as: (1) the child's need for permanency and length of time in foster care; (2) whether the child is in a pre-adoptive home and bonded with foster parents; and (3) whether the foster home meets the child's needs. ***Id***. at 1113.

With these overarching legal principles in mind, we turn to Mother's first claim for relief, which challenges the orphans' court's findings pursuant to

Section 2511(a)(8) on sufficiency grounds. **See** Mother's Brief at 19-28. Instantly, the orphans' court concluded that there was sufficient evidence to involuntarily terminate Mother's parental rights. We agree.

Mother concedes that the first aspect of Section 2511(a)(8) is satisfied in this case, since the Children had both been removed from her care since May 2020, or more than two years, at the time of the filing of the termination petition. **See id**. at 28. However, she argues that "not all of the conditions which led to the removal or placement of [the Children] continue to exist," referring to her successful completion of parenting classes and similar efforts to address her other permanency goals. **See id**. at 28-29.

Respectfully, however, we find that Mother's arguments entirely fail to discuss the most serious aspect of the Children's removal, *i.e.*, the physical and indicated sexual abuse perpetrated by Mother and R.K. against the Children. As detailed above and testified to at the termination hearing, the Children disclosed multiple instances of such abuse to both Dr. O'Hara and Mr. Van Ness. **See** N.T., 10/28/22, at 11-13, 72-73, 77; **see also** Permanency Review Order, 10/13/22, at 3; Order Granting Motion to Suspend Visits, 7/19/22, at 1 (unpaginated). Furthermore, the ChildLine report alleging sexual abuse was indicated as to Mother. **See** N.T., 10/28/22, at 133.

Despite this overwhelming evidence, Mother's testimony at the termination hearing continued to flatly deny that any such abuse occurred. **See** N.T., 10/28/22, at 199 ("I mean, I do believe they suffered from trauma

- 11 -

with their father not being around but other than that, I took very good care of my children. I'm pretty much all they had."). Indeed, she testified to her belief that the Children are lying. ***See id***. at 203 ("Well, that's all I've been trying to prove is that, you know, my children are fabricating stories."). It is abundantly clear from the certified record that Mother is unable to even acknowledge her role in the abuse perpetrated against the Children, as testified to by Dr. O'Hara, Mr. Van Ness, and Ms. Burzynski. ***See id***. at 14, 55, 77-78, 138. Furthermore, Mother has deepened and solidified her domestic ties to the Children's co-abuser, R.K., with whom she now shares both a child and a home. ***See id***. at 8, 104-05, 216.

Overall, we readily conclude that the record supports the orphans' court's finding that the conditions which led to the Children's removal from Mother's care still exist. As Ms. Burzynski stated in her testimony, despite Mother's compliance with certain aspects of her permanency goals, she has "not actually addressed the issues" that led to the Children's removal. ***See id***. at 167. Accordingly, while Mother may have completed some aspects of her permanency goals, the abusive environment that initially precipitated the Children's removal is unabated. Thus, the second prong of Section 2511(a)(8) is also satisfied in the above-captioned cases.

Finally, we consider whether termination of parental rights would best serve the needs and welfare of the Children. As detailed above, the abuse that the Children endured in Mother's care is not reasonably in dispute. At

the termination hearing, Dr. O'Hara testified that such abuse significantly impedes the development of children like A.D. and K.D., as follows:

> [W]hen children do not experience a caregiver as a safe and stable placement, I think it can place children at a lot of risk for a lot of things. From my perspective, in order for children to focus on developmental things that are appropriate for them, they need the building blocks of safety, security, trust, and stability. If these things are lacking, it's very difficult for a child to focus on maintaining relationships, focus on building competency at school because the child is not in a situation of safety which can allow the child to explore and expand one's developmental trajectory.

*See* N.T., 10/28/22, at 56-57. These concerns were echoed by Mr. Van Ness, who also expressed "significant concern" about the Children's safety in Mother's care. *See id*. at 96. Similarly, Ms. Burzynski described the abuse of the Children as "a huge safety issue" which outweighs any arguable need to continue the Children's relationship with Mother. *See id*. at 138, 148. This testimony provides more-than-adequate support for the orphans' court's conclusion that termination would serve the Children's needs and welfare pursuant to the third and final prong of Section 2511(a)(8).

Based upon the foregoing, we observe no abuse of discretion or error of law in the orphans' court's finding that sufficient grounds existed to involuntarily terminate Mother's parental rights pursuant to Section 2511(a)(8). Since the record supports the orphans' court's conclusion and credibility determinations, we may not disturb them.

We now turn to Section 2511(b), which requires us to consider whether termination of Mother's parental rights would be appropriate in view of the

developmental, physical and emotional needs and welfare of the Children. *See* 23 Pa.C.S.A. § 2511(b).  We note that while no formal bond analysis was conducted by CYF in this case, such an evaluation is not necessary under Pennsylvania law.  *See In re D.L.B.*, 166 A.3d 322, 328 (Pa. Super. 2017) ("[W]hen evaluating a parental bond, the court is not required to use expert testimony.  Social workers and caseworkers can offer evaluations as well.  Additionally, Section 2511(b) does not require a formal bonding analysis.") (internal citation and quotation marks omitted).

Assuming, *arguendo*, that Mother and the Children share some manner of bond, the record does not necessarily reflect that any such connection is parental in nature.  *See* N.T., 10/28/22, at 75-76 (Mr. Van Ness reporting that the Children would act "nervous" in Mother's presence during therapeutic visits).  Indeed, Dr. O'Hara noted that both A.D. and K.D. described their relationship with Mother in uniformly negative and fearful terms.  *See id*. at 11-13.  Concomitantly, Mr. Van Ness reported that the Children are "strongly bonded" with Foster Parents.  *Id*. at 95-96.  Dr. O'Hara similarly testified that both A.D. and K.D. expressed that Foster Parents were "nice," and that they were better cared for by Foster Parents.  *See id*. at 9-14.  Finally, Mr. Van Ness and Ms. Burzynski each individually averred that termination of Mother's parental rights would not cause any severe detriment to the Children and would also serve their needs and welfare.  *See id*. at 95, 148.

Based upon the foregoing, we find no abuse of discretion or error of law in the trial court's finding that termination would best serve the developmental, physical, and emotional needs and welfare of the Children pursuant to Section 2511(b).

Accordingly, we affirm the orders involuntarily terminating Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(8) and (b).

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 12/4/2023