J-S47032-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: C.L.R., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.M.A., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2410 EDA 2023 |

Appeal from the Decree Entered August 24, 2023
In the Court of Common Pleas of Lehigh County Orphans' Court at No(s):
A2023-0006

BEFORE:   STABILE, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:              **FILED FEBRUARY 20, 2024**

J.M.A. ("Mother") appeals from the decree entered August 24, 2023, in the Court of Common Pleas of Lehigh County, which terminated her parental rights to her son, C.L.R., Jr. ("Child"), born in July 2020, pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[1]  We affirm.

We gather the relevant factual and procedural history of this case from the certified record.  The Lehigh County Office of Children and Youth Services ("CYS" or "the Agency") first became involved with this family prior to Child's birth in March 2017, when it received reports of unstable housing, domestic violence, and substance abuse concerning Mother and Father (collectively,

_____

[*] Former Justice specially assigned to the Superior Court.

[1]  In the same decree, the orphans' court also involuntarily terminated the parental rights of C.L.R. ("Father") pursuant to the same provisions of Section 2511.  Father did not file an appeal from that determination.

"Parents"). **See** Notes of Testimony ("N.T."), 3/27/23, at 31-32. At that time, Parents were unmarried, living together, and shared five children. The Agency's involvement ended when Parents voluntarily relinquished their parental rights to all five children, who were all adopted. **See id.** at 32-33.

In July 2020, CYS received a new referral after Mother tested positive for heroin at the time of Child's birth. **See id.** at 33-34. She also admitted to using heroin during the week immediately before Child's birth. **See id.** at 34. Thereafter, Child was hospitalized in the neonatal intensive care unit for opioid withdrawal through August 2020. **See id.** at 36-38.

On August 11, 2020, CYS obtained emergency custody of Child, which was confirmed at a shelter hearing held two days later. **See id.** Following several temporary custody arrangements, Child was placed in kinship care with his paternal uncle and aunt (collectively, "Kinship Parents") in September 2020, where he has remained during these proceedings. Kinship Parents are a pre-adoptive resource for Child. **See id.** at 193.

On September 8, 2020, Child was adjudicated dependent. In connection with those proceedings, Mother stipulated to the following facts:

> Child was born positive for heroin not administered by medical personnel, Mother tested positive for opioids at time of Child's birth and continued to test positive for controlled substances thereafter. Parents are homeless (living with relatives who are also involved with the Agency). Mother remains on parole with Lehigh County and has a criminal history. Mother is currently on probation for possession of narcotics and drug paraphernalia.

CYS Exhibit 3 at 9 (cleaned up). Mother also reported being diagnosed with bipolar disorder, depression, and anxiety disorder. *See* N.T., 3/27/23, at 78.

The court determined that Child's initial permanency goal was reunification with Parents.[2] To that end, the court directed Mother to: (1) participate in drug and alcohol treatment; (2) submit to random drug screenings to demonstrate sobriety; (3) obtain and maintain appropriate housing and employment; (4) cooperate with reunification services; and (5) participate in visitations with Child. *See* CYS Exhibit 3 at 11; N.T., 3/27/23, at 41. In permanency review orders entered between January 2021 and January 2023, the court determined that Mother's compliance with these directives was largely minimal or non-existent.[3]

Mother was afforded weekly supervised visitations with Child through Justice Works. *See id.* at 41-42, 59. Her participation in visits was reported to be fairly consistent, although she was sporadically unavailable due to intervening periods of incarceration on various criminal charges. We note that she never progressed to unsupervised visitations with Child.

Mother's criminal behavior continued. In December 2020, she was convicted of simple assault after she attempted to hit Father with a motor

---

[2] In May 2021, Child's permanency goal was revised to include the concurrent objective of placement with a "fit and willing relative." CYS Exhibit 3 at 21.

[3] Between January 2022 and January 2023, Mother's compliance with her permanency reviews was rated as substantial or moderate. As discussed further *infra*, however, this period did not yield any long-term progress.

- 3 -

vehicle. *See id.* at 9-10, 44-45, 118. She was incarcerated from January 2021 until April 2021, and released on probation which ended in January 2022. *See id.* at 13-14. Contemporaneously, she was convicted of theft by deception in connection with a "check cashing incident" and received a 12-month probationary sentence in June 2022. *Id.* at 14-15. That same month, she was arrested for assaulting Father, again, and for resisting arrest when she was taken into custody. *See id.* at 14-16. In November 2022, Mother was sentenced to an additional term of probation. *See id.* at 16.

Mother's probation conditions required that she have no contact with Father. *See id.* at 19. In December 2022, Mother was arrested for an alleged probation violation after she was observed walking with Father. *See id.* at 18-19. She was incarcerated in connection with the alleged violation. The same month, Mother was discharged unsuccessfully from Justice Works after missing too many scheduled visits with Child. *See id.* at 163-65.

On January 10, 2023, CYS filed a petition seeking to involuntarily terminate Mother's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b).[4] The orphans' court held a termination

_____

[4] The record is silent concerning the appointment of legal interest counsel for Child pursuant to 23 Pa.C.S.A. § 2313(a). However, Michael Gough, Esquire, served as Child's guardian *ad litem*. Insofar as Child was two years old at the time of these proceedings and incapable of articulating a preference with respect to termination, we find no structural defect in the instant case. *See In re T.S.*, 192 A.3d 1080, 1092-93 (Pa. 2018) (holding that "if the preferred outcome of a child is incapable of ascertainment because the child is very
*(Footnote Continued Next Page)*

- 4 -

hearing on March 27, 2023, at which time Child was two years old. The Agency adduced testimony from Lehigh County probation officer Derek Ruth; CYS caseworkers Elissa Gray, Patty Sue Buskirk, and Hayley Hutchinson;[5] and Justice Works family resource specialists Robin Roman and Iris Torres.[6] CYS also entered into evidence various documentation related to Mother's criminal history and Child's dependency proceedings.

At the time of the hearing, Mother remained incarcerated on her pending probation violations. *See* N.T., 3/27/23, at 19. Nonetheless, she appeared at the hearing and was represented by counsel. She elected not to testify on her own behalf and did not offer any additional evidence.

On August 24, 2023, the orphans' court filed a decree involuntarily terminating Mother's parental rights to Child pursuant to Section 2511(a)(1),

---

young and pre-verbal," then Section 2313(a) "is satisfied where the court has appointed an attorney-guardian *ad litem* who represents the child's best interests during such proceedings.").

[5] The three CYS caseworkers were the individuals assigned to Mother's case during its lifetime. Specifically, Ms. Gray worked with Mother from October 2020 through May 2021. *See* N.T., 3/27/23, at 33, 76. Thereafter, Ms. Buskirk assumed responsibility for the matter until Ms. Hutchinson succeeded her in April 2022. *See id*. at 178. Ms. Hutchinson testified she remained assigned to the case at the time of the termination hearing. *See id*. at 177.

[6] Along similar lines, both Ms. Roman and Ms. Torres worked with Mother on behalf of Justice Works at different times. Specifically, Ms. Roman was assigned to the case from January 2020 until July 2021. *See* N.T., 3/27/23, at 114. At that point, Ms. Torres took over the case and remained assigned to it until December 2022, when visitation services ended. *See id*. at 158.

(2), (5), (8), and (b). The same day, the orphans' court also filed a memorandum opinion explaining its legal and factual findings.

On September 22, 2023, Mother filed a timely notice of appeal along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). In lieu of a Rule 1925(a)(2)(ii) opinion, the orphans' court submitted a statement referring to the reasonings articulated in its August 24, 2023 memorandum opinion.

Mother has raised two issues for our consideration:

A.    Did the orphans' court err as a matter of law and/or abuse its discretion in finding that CYS met the requirements of 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8) by clear and convincing evidence?

B.    Did the orphans' court err as a matter of law and/or abuse its discretion in finding that CYS sustained their burden of proof by clear and convincing evidence that the termination of Mother's rights to Child best meet the needs and welfare of the Child as required by 23 Pa.C.S.A. § 2511(b)?

Mother's Brief at 4 (cleaned up).

Our standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. Where the orphans' court's factual findings are supported by the evidence, an appellate court may not disturb the orphans' court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court

may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, the orphans' court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id.* at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under at least one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 620 Pa. 602, 628, 71 A.3d 251, 267 (Pa. 2013). This Court need only agree with the orphans' court's determination as to "any one subsection of [Section] 2511(a), in addition to [Section] 2511(b), in order to affirm the termination of parental rights." *T.S.M.*, *supra* at 267.

Our analysis in the instant case will focus upon Section 2511(a)(8) and (b), which provides as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> . . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8), (b).

In order to satisfy Section 2511(a)(8), the petitioner must prove that: (1) the child has been removed from the parent's care for at least 12 months; (2) the conditions which led to the removal or placement still exist; and (3) termination of parental rights would best serve the needs and welfare of the child. *See In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa. Super. 2018).

Section 2511(a)(8) does not necessitate an evaluation of a parent's willingness or ability to remedy the conditions that led to the removal of the child. *See In re M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017). Rather, our inquiry is focused upon whether the at-issue "conditions" have been "remedied" such that "reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009). Thus, the statute recognizes "that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. We cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *Id.* at 11-12 (internal citations and quotation marks omitted).

Finally, this Court has also explained that,

while both [§] 2511(a)(8) and [§] 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to [§] 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by [§] 2511(b); as such, they are distinct in that we must address [§] 2511(a) before reaching [§] 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*).

If a petitioner establishes adequate grounds for termination pursuant to Section 2511(a), we then turn to Section 2511(b), which requires that the court "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). Of note, we "should consider the matter from the child's perspective, placing [their] developmental, physical, and emotional needs and welfare above concerns for

the parent." ***In the Interest of K.T.***, \_\_\_ Pa. \_\_\_, 296 A.3d 1085, 1105 (Pa. 2023). Moreover, this determination "should not be applied mechanically," but "must be made on a case-by-case basis," wherein "the court must determine each child's specific needs." ***Id.*** at 1106. Thus, there is no "exhaustive list" of factors that must be considered. ***Id.*** at 1113 n.28. While the particular facts of each case determine the factors to be considered, our precedent indicates that relevant points of inquiry include "intangibles such as love, comfort, security, and stability." ***T.S.M.***, ***supra*** at 267.

Our Supreme Court has mandated, however, that an evaluation pursuant to Section 2511(b) should consider the child's bond with his or her parent. ***See In re E.M.***, 533 Pa. 115, 121-22, 620 A.2d 481, 484-85 (Pa. 1993). Specifically, we must render "a determination of whether the bond is necessary and beneficial to the child[.]" ***K.T.***, ***supra*** at 1113. This evaluation involves consideration of the effect of severing the child's bond with their parent. ***Id.*** at 1109. In termination matters, "severance of a necessary and beneficial relationship is the kind of loss that would predictably cause 'extreme emotional consequences' or significant, irreparable harm." ***Id.*** at 1109-10 (quoting ***E.M.***, ***supra*** at 484). Our Supreme Court has distinguished, however, "extreme emotional consequences" from a mere "adverse impact" in the termination context. ***Id.*** at 1111. Specifically, Pennsylvania courts must not truncate their analysis and preclude severance "based solely on evidence of an 'adverse' or 'detrimental' impact to the child." ***Id.*** at 1114.

- 10 -

Furthermore, "courts must not only consider the child's bond with the biological parent, but also examine the . . . love, comfort, security, and stability the child might have with the **foster** parent." ***K.T.***, ***supra*** at 1111 (emphasis in original; cleaned up). Thus, we consider factors that arise from the facts of each case, such as: (1) the child's need for permanency and length of time in foster care; (2) whether the child is bonded with foster parents; and (3) whether the foster home meets the child's needs. ***Id.*** at 1113.

Overall, "bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." ***Id.*** at 1109.

With this legal framework in mind, we turn to Mother's first claim for relief, which challenges the orphans' conclusion that CYS had offered sufficient evidence pursuant to Section 2511(a)(8). ***See*** Orphans' Court Opinion ("O.C.O."), 8/24/23, at 8-9. Specifically, Mother asserts that the orphans' court failed "to examine the totality of the circumstances" or "to examine Mother's justifications." Mother's Brief at 11. We disagree.

Initially, we note that Child was removed from Mother's care in August 2020. Thus, at the time of the termination hearing in March 2023, Child had been subject to removal for approximately thirty-one months. Consequently, the first prong of Section 2511(a)(8) is clearly satisfied here in that Child has been removed from Mother's care for at least twelve months.

With respect to the second element of Section 2511(a)(8), there is ample evidence to support the orphans' court's findings. Specifically and as detailed above, the conditions underlying Child's removal included, *inter alia*, Mother's: (1) ongoing substance abuse; (2) lack of appropriate housing; (3) lack of stable employment; and (4) criminal behavior.

Mother's substance abuse is well-documented throughout this case. As Ms. Gray testified, Child was originally removed from Mother's care due to her use of heroin during the pregnancy. *See* N.T., 3/27/23, at 33-36. Mother made some attempts to address her substance abuse issues. Ms. Gray and Ms. Buskirk each reported that Mother had engaged in "dual diagnosis" treatment for both her mental health and substance abuse issues through an organization referred to as Pyramid. N.T., 3/27/23, at 44, 73, 77-78. However, Ms. Buskirk averred that Mother was unsuccessfully discharged from that program in October 2021 for missing "six scheduled appointments." *Id.* at 78-80, 112. Thereafter, the testimonies of Ms. Buskirk and Ms. Torres indicate that Mother obtained a "walk-in" drug and alcohol evaluation and attended a three-week, inpatient rehab. *See id.* at 87-88, 146.

These treatment efforts, however, did not yield any notable improvements in Mother's behavior. Ms. Gray, Ms. Buskirk, and Ms. Hutchinson all testified that Mother was inconsistent in attending her random drug screenings once court supervision began. *See id.* at 46, 80-81, 184-85. Between March 2021 and February 2023, Mother also tested positive for

narcotics on nineteen different occasions, including amphetamines, cocaine, benzodiazepines,[7] and marijuana. **See** CYS Exhibit 5; N.T., 3/27/23, at 57. Furthermore, Ms. Burkirk reported that Mother's screens repeatedly yielded results for creatinine, which is indicative of attempts to mask results by consuming excessive amounts of fluid. **See** N.T., 3/27/23, at 106-07. Indeed, Mr. Ruth testified Mother confessed to ingesting "six bags" of cocaine during the first week of December 2022, alone. **See id.** at 18.

Similarly, the certified record uniformly indicates that Mother has largely failed to maintain stable housing. In September 2020, she was homeless. **See** CYS Exhibit 3 at 9. Mr. Ruth testified that, thereafter, Mother was incarcerated from January 2021 until April 2021. **See** N.T., 3/27/23, at 13-14. Upon her release, Mr. Ruth and Ms. Gray testified that Mother found temporary housing at a women's recovery shelter, Lazarus House. **See id.** at 29. However, Ms. Buskirk explained that Lazarus House was not considered appropriate housing for reunification purposes. **See id.** at 81. Ms. Buskirk also testified that from December 2021 through April 2022, Mother lived at an apartment that was paid for by the Conference of Churches. **See id.** at 89. However, Mr. Ruth reported that Mother again lacked any "stable residence" in June 2022. **See id.** at 29-30. Aside from these limited periods, Mother lived a largely transient existence. **See id.** at 142-43, 179.

---

[7] There is no evidence Mother had a prescription for this pharmaceutical at the time she tested positive. **See** N.T., 3/27/23, at 81.

There is also no dispute that Mother has been without steady employment. Ms. Gray testified that Mother was unemployed and only began working with a temporary placement agency in April 2021. *See* N.T., 3/27/23, at 57-59. Ms. Roman also testified that Mother continually struggled to keep a job and never succeeded in securing consistent employment. *See id.* at 120-22. Ms. Buskirk similarly reported that Mother was not able to hold down a job. *See id.* at 80-82, 89-90. According to Ms. Buskirk, Mother's most significant job was a six-week stint with Dollar Tree, which ended following a "physical altercation" between Mother and the store manager. *Id.* at 81-82.

Mother's criminal behavior has also persisted throughout this matter. Initially, Mother conceded that she was already on probation for narcotics-related offenses at the beginning of the Agency's involvement concerning Child. *See* CYS Exhibit 3 at 9. Thereafter and as detailed by Mr. Ruth and Ms. Gray, Mother committed a steady series of criminal offenses, including theft, resisting arrest, and multiple instances of assault. *See* N.T., 3/27/23, at 13-16, 44-45. Indeed, at the time of the termination hearing, Mother was incarcerated on multiple probation violations. *See id.* at 19.

Based upon the foregoing, it is beyond cavil that the conditions that led to Child's removal persisted at the time of the termination hearing. Accordingly, the second prong of Section 2511(a)(8) is satisfied.

Finally, we will consider whether termination will best serve the needs and welfare of the child, *i.e.*, the third and final aspect of Section 2511(a)(8).

The orphans' court concluded that Child's "needs and welfare are best served by termination of Mother's . . . parental rights so he can achieve permanency and maintain the stability his kinship caregivers have provided during his life." O.C.O. at 8.  By contrast, the orphans' court found that Mother was no closer to being a permanent resource for Child despite nearly three years of services and opportunity for improvement.  *See id.*

The record fully supports this finding.  Based upon her first-hand observations, Ms. Torres opined Child is secure and well-cared for in Kinship Parents' custody.  *See* N.T., 3/27/23, at 163.  She also reported seeing Child seek and receive affection and reassurance from Kinship Parents.  *See id.* at 173.  Ms. Hutchinson testified that Child is progressing well in Kinship Parents' care and described their home as loving and nurturing.  *See id*. at 193.  Ms. Hutchinson, in particular, opined termination would be in Child's best interest since it would preserve the most "consistent" and "healthy" source of support in Child's life:  "[C]hild has been consistently living with [Kinship Parents] for the majority of [his] life.  And [Child] is very happy and content there.  And [his] medical, physical, and emotional needs are being met."  *Id.* at 194-95.

Overall, we discern no abuse of discretion or error of law in the orphans' court's findings pursuant to Section 2511(a)(8).  Thus, we now turn our attention to the orphans' court's findings pursuant to Section 2511(b).  Mother argues, again, that the orphans' court's findings were not supported by sufficient evidence.  *See* Mother's Brief at 17-20.  We must disagree.

With respect to the bonding analysis mandated by Pennsylvania law, there seems to be little question that Mother and Child are bonded, based upon the testimonies of both Ms. Roman and Ms. Torres. *See id.* at 133, 171 (indicating that Child and Mother have a close and affectionate bond). The orphans' court, however, reasoned that the bond Child shared with his Kinship Parents was the "true parental" connection in this case, reasoning as follows:

> [Child] has never lived with his parents, but Mother managed to develop a bond with [Child] during her supervised visits as evidenced by his interactions with her, such as smiling at her when she arrived and whining or crying when it was time to leave. . . . Nevertheless, Mother [has] essentially been [a visitor] in Child's life, whereas [Kinship Parents] have been entrusted with and fulfilled the true parental role toward [Child]. Significantly, . . . Mother stopped visiting in December of 2022. [Child] needs and deserves stability, consistency, nurturance, and permanency. Mother . . . [is] still unable to provide him with these intangibles, let alone a most basic tangible need of stable housing. His life cannot remain on hold until Mother . . . pull[s herself] together to become [a] true parental resource . . . . [W]e find that the bond he has with [Kinship Parents] significantly exceeds the bond he has with Mother . . . and is the more important bond to preserve at this point. . . . In the totality of the circumstances, the benefits of stability and permanency in this stable, consistent, loving home outweigh any potential detriments that may occur due to severance of Mother's . . . parental bond.

O.C.O. at 9-10.

In reaching these conclusions, the orphans' court credited the testimony of Ms. Hutchinson, who expressed identical sentiments concerning Child's welfare at the termination hearing. *See* N.T., 3/27/23, at 194-95. Given that the orphans' court's findings pursuant to Section 2511(b) are supported by the certified record and free from legal error, we will not disturb them.

Based on the foregoing, we observe no abuse of discretion or error of law in the orphans' court's findings pursuant to Section 2511(a)(8) and (b). Thus, we affirm the decree involuntarily terminating Mother's parental rights.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date:  2/20/2024