J-A15012-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.O.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 223 MDA 2025 |

Appeal from the Decree Entered January 16, 2025
In the Court of Common Pleas of Berks County Orphans' Court at No(s):
88974

BEFORE:   BOWES, J., STABILE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BOWES, J.:                    **FILED JUNE 30, 2025**

L.R. ("Mother") appeals from the decree granting the petition filed by Berks County Children and Youth Services ("BCCYS"), which involuntarily terminated Mother's parental rights to her son, L.O.C., born in August 2022.[1] We affirm.

We glean the factual and procedural history of this matter from the certified record. Mother was born in New York, raised in Puerto Rico, and moved to Pennsylvania in 1993. Her primary language was Spanish, but she also spoke English and graduated from high school in Pennsylvania. She first

---

[*] Former Justice specially assigned to the Superior Court.

[1] L.O.C.'s father, J.C. ("Father"), also had his parental rights involuntarily terminated. His attorney was present at the termination hearing, but claimed no position due to Father's absence. Father has not filed an appeal.

became known to BCCYS in 2010 when her four older children were placed in foster care. At the time, the agency had concerns about medical neglect, drug and alcohol abuse, lack of stable and suitable housing, domestic violence, inappropriate discipline, and lack of appropriate parenting skills. Upon completion of services, Mother was reunited with her children in 2012.

Thereafter, BCCYS reengaged with Mother in 2019, 2020, and 2021 because the agency had concerns similar to those that prompted its involvement in 2012. Each time, Mother rectified the problematic conditions, and the children were returned to her care. During BCCYS's involvement in 2021, Mother met Father. He lived with Mother and her four children in her apartment, and Mother became pregnant with L.O.C. One month after L.O.C. was born, BCCYS closed the 2021 case. Shortly thereafter, Mother filed a Protection from Abuse ("PFA") petition against Father naming herself and the five children as protected parties. She alleged that Father came home drunk, pinned her down on the bed, grabbed a hunting knife, and threatened to kill L.O.C. A temporary PFA order was entered, but Mother withdrew the petition three days later.

Pertinently, BCCYS became involved once more in December 2023, following reports of the parents' drug use and domestic violence, and Father abusing the children. Mother tested positive for methamphetamines and amphetamines, while Father refused testing. BCCYS implemented a safety

plan placing all five of Mother's children with their maternal aunts, and allowing Mother and Father to have supervised visits.

In seeking dependency for L.O.C., the agency cited ongoing concerns relative to Mother and Father's hostile behavior, domestic violence, drug and alcohol use, and inability to appropriately care for L.O.C. During this time, one of Mother's daughters also disclosed that she had been sexually abused by Father. An indicated report identified him as the perpetrator.[2] Nonetheless, Mother repeatedly denied her daughter's allegations against Father.

L.O.C. was declared dependent on May 5, 2023, and BCCYS established his placement goal as reunification with a concurrent goal of adoption. He was placed in a pre-adoptive foster care home where he has remained during these proceedings. Concerning L.O.C.'s half-siblings, Mother consented to have her rights terminated as to her eldest son, and he has been adopted by his maternal uncle. Her firstborn daughter was placed with her father, but has since returned to BCCYS's custody. The other two children have been taken care of by their fathers.

Relative to L.O.C.'s placement, Mother was assigned several permanency goals based on the aforementioned concerns. She was also

---

[2] Father also has a lengthy criminal history. *See* BCCYS Exhibit 34. However, no criminal charges were filed against Father for the indicated report of sexual abuse against Mother's daughter.

directed to participate in parenting education, a non-offending parent evaluation, a mental health assessment, a drug and alcohol screening, random urinalyses, domestic violence classes, supervised visitation, and casework services through BCCYS. Further, she was required to obtain stable and appropriate housing and income, and to inform BCCYS of any changes.

The reports of the permanency hearings reveal that in October 2023, Mother was substantially compliant with the permanency plan and made moderate progress towards alleviating circumstances necessitating placement. *See* BCCYS Exhibit 4. In March 2024, Mother was found to be substantially compliant with the plan, but her progress was minimal. *See* BCCYS Exhibit 5. Lastly, in August 2024, Mother was deemed moderately compliant, but again made minimal progress towards her goals. *See* BCCYS Exhibit 7.

Meanwhile, on July 15, 2024, BCCYS filed the instant petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). The court appointed counsel for Mother and L.O.C.[3]

At the ensuing termination hearing, BCCYS presented Lisa Reigle, Mother's Partners in Parenting trainer, who testified about Mother's weekly

---

[3] Attorney Ashley Esposito served as guardian *ad litem* and court-appointed counsel for L.O.C. in conformity with 23 Pa.C.S. § 2313(a). The orphans' court found that Attorney Esposito's dual representation did not create a conflict between the child's legal interest and best interests.

four-hour supervised visitations with L.O.C. Although Mother understood most of the curricula for her parental training, which was in English, she did not read the written materials or complete homework. Ms. Reigle attempted to read the content aloud to Mother, but she was easily distracted, and Mother often lost attention or wandered away when Ms. Reigle showed video lessons. BCCYS did not offer, nor did Mother request, that any of the materials be translated to Spanish.

Ms. Reigle discovered Mother responded better to hands-on instruction. However, even after acknowledging that she understood the concepts that Ms. Reigle had demonstrated, Mother did not implement some of the lessons. For example, Ms. Reigle had to repeatedly teach Mother how to cut the two-year-old child's food so that he would not choke. Similarly, Mother required more than ten months of instruction before implementing Ms. Reigle's basic advice concerning L.O.C.'s cell phone privileges. Essentially, Ms. Reigle was concerned about Mother's ability to parent her son without assistance.

Furthermore, Mother attended the parenting classes inconsistently. Ms. Reigle testified that Mother missed five to six parental training sessions in the three months preceding the termination hearing. In an effort to accommodate Mother's schedule, Ms. Reigle offered morning sessions. However, Mother claimed not to be a "morning person" and refused to reschedule during those hours. *See* N.T. Termination Hearing, 12/16-17/24, at 30.

Angelica Farrisi, a specialized outpatient therapist at the Commonwealth Clinical Group, began to work with Mother in her non-offending parent and domestic violence treatment in April 2024, and testified to her experience with Mother. She explained that Mother has a borderline range IQ of 73, reads at a seventh-grade level, and responded to instructions better when concepts were broken down and repeated. While Mother's coping skills showed improvement, Ms. Farrisi attested that Mother continued to struggle to apply what she had learned.

As it relates to Mother's exposure to violence, she told Ms. Farrisi that her relationship with Father had ended, and she did not report having a new romantic partner. Ms. Farrisi noticed that Mother could articulate a "very basic understanding" of how domestic violence could affect her children, but that there was a "disconnect with more specifically how and why it may have affected her relationships as well as the kids[.]" *Id*. at 40. Mother also denied her daughter's allegations about Father's sexual abuse. Ms. Farrisi had concerns about Mother's parenting abilities and whether she could properly manage her emotions. Mother consistently attended therapy sessions at the beginning of her work with Ms. Farrisi, but her participation began to taper off in the last month before the termination hearing.

Sara Sweitzer, an adoption caseworker, testified that she worked with Mother starting in June 2024, and was familiar with Mother's history with BCCYS. She visited Mother's studio apartment, which had one bed for herself,

a dog crate, and a kitchenette. She did not have a bed for L.O.C. Ms. Sweitzer noted that Mother maintained employment, but it was not consistent. Mother's shifting work schedule created difficulty in maintaining visitation with L.O.C.

Ms. Sweitzer also acknowledged Mother's compliance with the permanency plan, including having tested negative for methamphetamines and amphetamines after January 2023, but stated that "there was minimal progress towards alleviating the circumstances that necessitated the [child's] placement." *Id*. at 104. Ms. Sweitzer explained that "compliance" only meant that Mother participated in services, but that "progress" analyzed whether Mother had been able to "remedy the concerns through that treatment and through the parent education and things of that nature[.]" *Id*. at 106. She believed that Mother continued to struggle to identify abusive behavior in romantic partners, and questioned whether Mother could "be a protective factor for her children[.]" *Id*. at 76.

Ms. Sweitzer further observed L.O.C. with his foster family on a monthly basis. She opined that the child was strongly bonded with his foster family. Specifically, as to L.O.C.'s foster siblings, she thought "[h]e meshe[d] with them so well and seamlessly." *Id*. at 78. L.O.C.'s foster parents provided him with speech therapy and catered to his tangible and emotional needs. Mother also maintained a relationship with L.O.C.'s foster mother during the

child's placement. Ms. Sweitzer ultimately concluded that termination of Mother's parental rights would not be a detriment L.O.C.

BCCYS lastly presented Laura Fritts, M.D., an expert in the field of clinical psychology with the Berks Counseling Associates. She conducted a clinical interview with Mother, during which Mother could barely keep her eyes open. Dr. Fritts determined that Mother likely suffered from undiagnosed depression. Based upon Mother's state of mind during this evaluation, the orphans' court credited Dr. Fritts's testimony, but gave it little weight.

Mother opted to testify in opposition to the petition. She explained that throughout her history with BCCYS, caseworkers and other staff assisted her with raising her children. In the instant matter, Mother stated that Ms. Reigle would give her tips on parenting, and that Mother implemented "[s]ome of them[.]" *Id*. at 123. She also claimed that she understood a majority of the parenting skills curriculum that was written in English, and did not inquire whether anything could be offered in Spanish. *Id*. at 124, 130. She explained that in her parental training, she "t[oo]k whatever [Ms. Reigle] taught [her,] what was right from wrong on certain things[,] and just appl[ied] it to [her]self." *Id*. at 125. She further stated that she learned about "[r]elationship red flags" through her therapy sessions with Ms. Farrisi. *Id*. at 125.

At the time of the hearing, Mother claimed that her connection to Father had ended "[m]onths ago." *Id*. at 127. Prior to Mother and Father's

relationship, Mother's sister was also romantic with Father. Mother explained that her sister had warned her that Father was abusive. However, Mother did not believe the allegations "until [she saw] it for [her]self." *Id*. at 129. After Father became abusive, Mother admitted that she stayed with Father. She attested that Father would hit her, and that at one point, he pushed her down the stairs. Mother had regrets about being involved with Father.

Mother also called her peer recovery specialist, Karly Fisher, as a witness. She confirmed that Mother had maintained sobriety for one year. Ms. Fisher testified that although her attendance was not consistent, Mother actively participated in individual and group sessions. Ms. Fisher did not have Mother drug tested because she did not believe it was necessary.

Lastly, Mother called a BCCYS caseworker, Julianna Zimmerman, who provided background information about working with Mother during the 2021 case. The majority of her involvement preceded L.O.C.'s birth. Ms. Zimmerman explained that BCCYS initiated services during this time because there were reports of Mother throwing a phone at one of her daughters, and her other daughter having burns on the bottom of her foot. The agency attempted an "in-home" program for Mother's family, so the children did not have to be removed. BCCYS closed the 2021 case because Mother seemed to remedy the issues that prompted the agency's involvement. Just over ninety days later, however, the incidents bringing rise to this appeal brought Mother

to the agency's attention again. Due to the timeline of events, Ms. Zimmerman was not assigned to the case.

L.O.C. has remained in foster care since May 5, 2023. His attorney stated that L.O.C. is strongly bonded with his foster parents and looks to them for support. She explained that he is an energetic child who does well with his foster siblings. Attorney Esposito advocated for termination of Mother's parental rights to allow L.O.C.'s foster parents to adopt him, as she believed that would best serve his needs.

The orphans' court granted BCCYS's petition by opinion and decree on January 16, 2025. It found that the agency established the elements of § 2511(a)(1), (2), (5), (8), and (b) by clear and convincing evidence. Mother timely appealed and simultaneously submitted her statement of errors in accordance with Pa.R.A.P. 1925(a)(2)(i) and (b). The court responded with a Rule 1925(a) opinion.

Mother raises the following issues for our consideration:

1. Did the [orphans' c]ourt err, or abuse its discretion, by finding that BCCYS had met its burden of proof under § 2511(a) (1), (2), (5) and (8), when sufficient and credible evidence was presented at the time of trial that Mother had not shown a settled purpose to relinquish her claim to her child; that she had remedied, or could remedy in a reasonable time, the issues and conditions that led to her child's placement; that the services available to her were effective, once implemented with consideration for Mother's learning disability; and that she has the capacity to parent her child, as she has illustrated while under BCCYS scrutiny in the recent past?

2. Did the [orphans' c]ourt err or abuse its discretion by discounting evidence that Mother's learning disability, and

- 10 -

difficulty reading, stalled her progress early in the case, but that, once information was presented to Mother orally, by providers aware of her difficulty reading, she succeeded in remedying the conditions that led to L.O.C.'s placement?

Mother's brief at 7 (citation altered).

We address Mother's contentions together, as they are interrelated.[4]

This Court's standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and

_____

[4] Indeed, contrary to the requirements of our procedural rules, Mother only included one argument section in her brief pertaining to the elements of § 2511(a). **See** Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part--in distinctive type or in type distinctively displayed--the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent.").

- 11 -

permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of Z.N.B.*, 327 A.3d 241, 247-48 (Pa.Super. 2024) (cleaned up).

Section 2511 of the Adoption Act governs the involuntary termination of parental rights and entails a bifurcated analysis. Initially, the focus is upon one of the eleven enumerated grounds that may warrant termination. *See* 23 Pa.C.S. § 2511(a). If the orphans' court determines that the petitioner has established one of these subsections by clear and convincing evidence, the court then assesses the petition pursuant to § 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *Interest of Z.N.B.*, 327 A.3d at 248. This Court need only agree with the orphans' court's conclusion as to any one subsection of § 2511(a), in addition to § 2511(b), to affirm termination.[5] *Interest of M.E.*, 283 A.3d 820, 830 (Pa.Super. 2022) (cleaned up).

Our analysis will focus upon § 2511(a)(8), which permits termination when:

> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, [twelve] months or more have elapsed from the date of removal or placement, the conditions which led to the removal or

---

[5] Mother does not challenge the court's findings pursuant to § 2511(b). As a result, we only address § 2511(b) to the extent that it affects our § 2511(a)(8) discussion.

placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . . .

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

To establish § 2511(a)(8), a petitioner must show: "(1) that the child has been removed from the care of the parent for at least twelve months; (2) that the conditions which led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child." *Interest of M.E.*, 283 A.3d at 832. Importantly, the Court is not required to evaluate a parent's "willingness or ability to remedy the conditions that led to the placement of his or her children." *In re M.A.B.*, 166 A.3d 434, 446 (Pa.Super. 2017). Instead, "the relevant inquiry regarding the second prong of § 2511(a)(8) is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *Interest of M.E.*, 283 A.3d at 832. The subsection specifically "accounts for the needs of the child." *Id*.

Although application of § 2511(a)(8) may seem severe, this Court has explained:

> [B]y allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The [C]ourt cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen . . . months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

*In re M.A.B.*, 166 A.3d at 447 (cleaned up).

Mother contends that the orphans' court abused its discretion in terminating her parental rights pursuant to § 2511(a)(8) because it relied "heavily" upon the allegations in BCCYS's petition. *See* Mother's brief at 25. Instead, Mother argues, the court should have inquired as to whether Mother cured those issues, not whether "those conditions had ever existed." *Id*. She emphasizes that she is no longer in a relationship with Father, and she is better able to identify problematic behaviors in romantic partners. *Id*. at 25-26. She also maintains that she has remained sober. *Id*. at 26. Mother further asserts that she lives in an apartment that is suitable for children and has steady employment. *Id*. at 27. Lastly, she states that she improved her parenting skills "once she began to use a hands-on instructional approach[.]" *Id*. Namely, Mother claims that she has "learned to develop boundaries regarding L.O.C.'s use of a cellphone." *Id*.

- 14 -

In its Rule 1925(a) opinion, the orphans' court acknowledged Mother's compliance with services. However, with the exception of sobriety, the court determined that "Mother has not remedied any of the conditions that led to the initial placement" of L.O.C. **See** Orphans' Court Opinion, 1/16/25, at 25. It concluded that it could not "ignore Mother's choice in a romantic partner, her minimization or outright deception of Father's violent tendencies, Mother's inappropriate and/or limited parenting, and prior drug use[.]" **Id**. at 24. The court credited the testimony of BCCYS's witnesses that denying termination would "pose a further risk to the health and well-being of the [c]hild[,]" and questioned "whether Mother can ever fully appreciate the needs of the [c]hild." **Id**. at 24-25. What Mother presented in her testimony, the court concluded, "did not negate the clear and convincing evidence presented by BCCYS in favor of terminating." **Id**. at 25. Finally, the court determined that "[w]hat is in the best interest of the [c]hild is outweighed by what little evidence was presented regarding the bond between Mother and [c]hild." **Id**. at 25.

We discern no abuse of discretion in the orphans' court's reasoning. It is clear that the first prong of the § 2511(a)(8) test is met where L.O.C. has remained in foster care for fourteen months. As to the second prong of whether Mother has remedied the conditions necessitating L.O.C.'s placement, BCCYS presented abundant evidence that she has not done so, and Mother did not prove otherwise. Although Mother is to be commended for

participating in the permanency plan and maintaining sobriety, BCCYS offered credible testimony demonstrating that Mother's progress in attempting to remedy most of the underlying conditions was not sufficient.

First, despite Mother's contentions, her living quarters have remained unsuitable for L.O.C. As Ms. Sweitzer observed, Mother did not have a bed for him, and her apartment otherwise lacked much furnishing. *See* N.T. Termination Hearing, 12/16-17/24, at 66. Her employment has also proven to be unsteady. While Mother has maintained some form of employment, Ms. Sweitzer explained that it was fleeting and inconsistent. *Id*. at 67. Importantly, her unpredictable schedule affected her ability to keep visitation appointments with L.O.C. *Id*. at 68.

Additionally, although Mother ended her relationship with Father, BCCYS caseworkers and her therapist attested that Mother continued to struggle to identify issues related to abuse. Ms. Sweitzer had concerns over Mother's ability to recognize problematic behaviors in romantic partners to protect her children. *Id*. at 76. Ms. Farrisi also attested that Mother had trouble understanding the consequences of being in an abusive relationship. *Id*. at 40-41. She further confirmed that Mother continued to deny her daughter's allegations that Father sexually abused her, despite the indicated report. *Id*. at 36, 41. Lastly, Mother acknowledged that she did not believe her sister when she told her that Father was abusive, and even when he proved himself

to be so, Mother continued with the relationship for a period of time. *Id*. at 129.

Mother also failed to remedy the concerns relative to her parenting skills. She missed or skipped five to six sessions with Ms. Reigle in the three months preceding the termination hearing and refused to reschedule sessions for the morning. *Id*. at 15-16, 31. Mother neglected to read material or complete homework for her training, and she frequently did not pay attention to videos. *Id*. at 14. She attested that she understood most written content, and never requested anything in Spanish. *Id*. at 124, 130. Even after Ms. Reigle utilized a hands-on approach to suit Mother's needs, Mother still disregarded certain lessons, including the instruction to cut L.O.C.'s food properly to reduce the risk of choking. *Id*. at 12-13, 123. Overall, Ms. Reigle credibly remained concerned about Mother's ability to parent L.O.C. without assistance. *Id*. at 15.

Accordingly, although Mother has made a modicum of progress in remedying the underlying conditions necessitating L.O.C.'s removal, the record bears out that reunification was not "imminent at the time of the hearing." *Interest of M.E.*, 283 A.3d at 832. L.O.C.'s life cannot "cannot be held in abeyance" while Mother "attempts to attain the maturity necessary to assume parenting responsibilities." *In re M.A.B.*, 166 A.3d at 447. Hence, the court did not abuse its discretion in concluding that the second prong of § 2511(a)(8) was met.

As to the last element, the court's determination that L.O.C.'s best interests would be served by termination of Mother's parental rights is also supported by the record. Importantly, L.O.C. is strongly bonded with his foster family. *See* N.T. Termination Hearing, 12/16-17/24, at 77-79, 214-15. As Ms. Sweitzer explained, L.O.C. thrives with his foster siblings and his foster parents tend to his tangible and emotional needs. *Id*. at 77-79. Attorney Esposito advocated on L.O.C.'s behalf that the child's best interest would be served by terminating Mother's parental rights. *Id*. at 215-17. The needs of the child are of the utmost importance in a § 2511(a)(8) analysis. *See Interest of M.E.*, 283 A.3d at 832; *In re M.A.B.*, 166 A.3d at 447. Other than stating that she wished to be reunited with her child, Mother did not rebut BCCYS's evidence with any indication of her bond with L.O.C. *See* N.T. Termination Hearing, 12/16-17/24, at 112. Therefore, the record supports the court's determination that termination of Mother's parental rights would serve L.O.C.'s best interest.

Based upon the foregoing, we cannot conclude that the orphans' court abused its discretion in terminating Mother's parental rights in accordance with § 2511(a)(8). Thus, we affirm.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 06/30/2025